Robert D. Luskin (D.C. Bar # 293621)
PATTON BOGGS LLP
2550 M Street NW
Washington, DC 20037
(202) 457-6190
(202) 833-1971 Facsimile

Attorney for the LIUNA GEB Attorney,
W. Douglas Gow and Kendall Ludwig

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DANNY ATTENBOROUGH, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Misc. # 1:06-MC-00006-JR |
| v. | ) | |
| | ) | |
| CONSTRUCTION AND GENERAL | ) | |
| BUILDERS LABORERS' LOCAL 79, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### THIRD-PARTY WITNESSES' RESPONSE
### IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL

RECEIVED

FEB 02 2006

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

# TABLE OF CONTENTS

Table of Authorities .................................................................................. ii

Background ............................................................................................. 2

Argument ................................................................................................ 7

     A.  The Work Product Doctrine ........................................................ 7

     B.  The Attorney-Client Privilege ................................................... 14

Conclusion ............................................................................................. 18

Exhibit 1: Luskin Declaration ........................................................ Tab 1

Proposed Order .............................................................................. Tab 2

## TABLE OF AUTHORITIES

## CASES

*In re Ashworth Sec. Litig.*,
    213 F.R.D. 385 (S.D. Cal. 2002) ...................................................................12

*Board of Educ. v. Admiral Heating & Ventilating, Inc.*,
    104 F.R.D. 23 (N.D. Ill. 1984)............................................................. 11-12

*Cobell v. Norton*,
    377 F. Supp. 2d 4 (D.D.C. 2005) ...........................................................14

*Director, Office of Thrift Supervision v. Vinson & Elkins, LLP*,
    124 F.3d 1304 (D.C. Cir. 1997) ...............................................................14

*Freeman v. Seligson*,
    405 F.2d 1326 (D.C. Cir. 1968) .................................................................9

*Hertzberg v. Veneman*,
    273 F. Supp. 2d 67 (D.D.C. 2003) ......................................................... 7-8

*Hickman v. Taylor*,
    329 U.S. 495 (1947).............................................................................7, 9, 11

*Janicker v. George Washington Univ.*,
    94 F.R.D. 648 (D.D.C. 1982)................................................................8, 12

*Judicial Watch, Inc. v. United States Dep't of Commerce*,
    196 F. Supp. 2d 1 (D.D.C. 2001) ........................................................ 11-12

*Mason Tenders Dist. Council v. LIUNA*,
    884 F. Supp. 823 (S.D.N.Y. 1995) .........................................................6, 9

*Mason Tenders Local Union 59 v. LIUNA*,
    924 F. Supp. 528 (S.D.N.Y. 1996) .........................................................6, 9

*Massachusetts v. First Nat'l Supermarkets, Inc.*,
    112 F.R.D. 149 (D. Mass. 1986)....................................................8, 11, 14

*Osternick v. E.T. Barwick Indus.*,
    82 F.R.D. 81 (N.D. Ga. 1979)..................................................................16

*SEC v. Canadian Javelin*,
    451 F. Supp. 594 (D.D.C. 1978)..............................................................16

*SEC v. Gulf & Western Indus., Inc.*,
    518 F. Supp. 675 (D.D.C. 1981) ........................................................ 14-15

*In re Sealed Case,*
    146 F.3d 881 (D.C. Cir. 1998) ................................................................8

*Serpico v. LIUNA,*
    Nos. 95C614, 94C1573, 95C1725, 1996 WL 41674, 151 L.R.R.M. (BNA)
    2460 (N.D. Ill. Jan. 30, 1996), *aff'd*, 97 F.3d 995 (7th Cir. 1996) ................5

*United States v. Davis,*
    131 F.R.D. 391 (S.D.N.Y. 1990) ..........................................................14

*United States ex rel. Pogue v. Diabetes Treatment Ctrs. Of Am.,*
    No. Civ. 99-3298, 2004 WL 2009413 (D.D.C. May 17, 2004) ....................8

*United States v. Nixon,*
    418 U.S. 683 (1974) ..........................................................................9

*United States v. Nobles,*
    422 U.S. 225 (1975) ..........................................................................8

*United States v. Paxson,*
    861 F.2d 730 (D.C. Cir. 1988) ............................................................11

*Upjohn Co. v. United States,*
    449 U.S. 383 (1981) ............................................................... 11, 14-15

*Willingham v. Ashcroft,*
    228 F.R.D. 1 (D.D.C. 2005) ..........................................................9, 11

## STATUTES

29 U.S.C. § 412 ....................................................................................10

29 U.S.C. § 464 ....................................................................................10

Fed. R. Civ. P. 26 ................................................................................7-9

Fed. R. Civ. P. 45 ................................................................................6-7

Robert D. Luskin (D.C. Bar # 293621)
PATTON BOGGS LLP
2550 M Street NW
Washington, DC 20037
(202) 457-6190
(202) 833-1971 Facsimile

Attorney for the LIUNA GEB Attorney,
W. Douglas Gow and Kendall Ludwig


UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DANNY ATTENBOROUGH, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Misc. # 1:06-MC-00006-JR |
| | ) | |
| CONSTRUCTION AND GENERAL | ) | |
| BUILDERS LABORERS' LOCAL 79, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## THIRD-PARTY WITNESSES' RESPONSE
## IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL

In the matter now before the Court, Plaintiffs Danny Attenborough, et al. ("Plaintiffs") have

filed a motion to compel highly confidential materials the disclosure of which poses a grave danger

to a uniquely successful ten-year-old union reform program that has been painstakingly maintained

by the Laborers' International Union of North America ("LIUNA"), and that has successfully

thwarted the influence of organized crime, advanced the cause of union democracy and promoted

greater fairness in the operation of union job referrals. The disclosures sought by Plaintiffs would

actually undermine the very principles that Plaintiffs purport to uphold in their underlying lawsuit.

To make matters worse, Plaintiffs seek disclosure of these materials by urging the Court effectively

to ignore fundamental protections placed over those materials by law, namely, the work product doctrine and the attorney-client privilege. Not surprisingly, no federal court has ever ordered the disclosure of confidential investigative materials or information developed by the internal reform program and, thus, the disclosure requested by Plaintiffs is wholly without precedent. Consequently, the LIUNA General Executive Board Attorney Robert Luskin, LIUNA Inspector General W. Douglas Gow, and Case Administrator Kendall Ludwig (collectively, the "Third-Party Witnesses"), respectfully ask the Court to deny Plaintiffs' Motion to Compel.

## BACKGROUND

In November 1994, the United States Attorney for the Northern District of Illinois presented LIUNA with a draft civil complaint under the Racketeer Influenced and Corrupt Organizations Act alleging, in substance, that for a substantial period of time, the organized crime entity known as La Cosa Nostra ("LCN") had a corrupting influence over LIUNA and its affiliates; and that the officers of LIUNA had failed to fulfill their fiduciary purpose to see that the union was free of corruption and to ensure that members could exercise their rights to participate fully and freely in union affairs. (Exhibit 1: Declaration of Robert D. Luskin ["Luskin Decl."] ¶ 2.)

In the course of negotiations over how to address the government's concerns, the General Executive Board of LIUNA amended its Constitution to adopt an Ethical Practices Code, which set standards of conduct for all union members, officers and employees, including prohibitions on knowing association with the LCN or knowingly permitting the LCN to influence union affairs. (Luskin Decl. ¶ 3.) The General Executive Board also adopted an Ethics and Disciplinary Procedure, which established four independent officers – an Inspector General ("IG"), General Executive Board Attorney ("GEB Attorney"), Independent Hearing Officer, and Appellate Officer – with complete and independent authority to investigate allegations of corruption, bring trusteeship

2

complaints or disciplinary actions, adjudicate disciplinary complaints and trusteeships, and provide for limited appellate review of certain of those findings and conclusions. (Luskin Decl. ¶ 3.)

LIUNA appointed W. Douglas Gow to serve as its Inspector General upon his completion of a long and distinguished record of service with the Federal Bureau of Investigation. (Luskin Decl. ¶ 5.) Consistent with the authority granted to him under the Ethics and Disciplinary Procedure, the Inspector General coordinates the investigation of all matters arising under the Ethical Practices Code and the Ethics and Disciplinary Procedure, including the knowing association of union members with La Cosa Nostra, and violations of federal and state labor law. (*Id*) The Inspector General oversees a team of investigators comprised primarily of former Special Agents of the FBI, the Department of Treasury and the Department of Labor. (*Id*) The Inspector General's staff conducts investigations and reports its findings to the Inspector General, almost always in writing. (*Id*) The intelligence developed by the Inspector General is supplemented by the government, which provides the Inspector General with access to materials and witnesses when such information would further the aims of the reform program and is permitted by law. (*Id*) Once the Inspector General has acquired evidence that he believes sufficient to warrant prosecution as a disciplinary matter or for imposition of a trusteeship or supervision, he will report such matters to the GEB Attorney for the latter's consideration. (*Id*)

Since the inception of the LIUNA reform program, the GEB Attorney has retained a Case Administrator to assist with the implementation of LIUNA's job referral rules, which were also a creation of the reform program. (Luskin Decl. ¶ 6.) Presently, Kendall Ludwig holds the position. (*Id*) In her capacity as Case Administrator, Ms. Ludwig receives calls and letters from LIUNA members who wish to report violations of the job referrals rules or who seek an explanation of the rules and how the rules are to be applied. (*Id*) It is also the Case Administrator's responsibility to assist the Inspector General with investigations of potential job referral violations and to assist the

3

GEB Attorney with any prosecution of related disciplinary or trusteeship actions. (*Id.*)  In the course of her duties, the Case Administrator receives, has access to and develops confidential investigative reports regarding job referral investigations. (*Id.*)

Along with the commencement of the reform program, LIUNA and the United States entered into a three-year agreement, dated February 13, 1995, under which the United States agreed to forbear from filing any civil complaint for a period of at least 90 days, while LIUNA implemented its internal reform program.  (Luskin Decl. ¶ 7.)  The agreement further provided that, at any time after 90 days, if the Assistant Attorney General for the Criminal Division concluded, in her sole discretion, that imposition of a consent decree was necessary or desirable, the parties would file a complaint and consent decree that provided for the appointment of court officers to oversee the affairs of LIUNA and undertake efforts to eradicate organized crime influence. (*Id.*)

On January 14, 1998, LIUNA and the United States extended the agreement until January 31, 1999, and thereafter entered into a new agreement effective through January 31, 2000.  (Luskin Decl. ¶ 8.)  On January 18, 2000, the United States and LIUNA entered into a further agreement under which LIUNA agreed, *inter alia*, to continue its internal reform programs for a period until approximately 2006 and to seek the prior consent of the United States before making any material change to the programs or substituting any of the independent officers. (*Id.*)  The United States retained the right to enforce these obligations through an injunction, but agreed to give up the right to seek the appointment of court officers through imposition of a consent decree. (*Id.*)

Since 1995, the United States has exercised close scrutiny over the conduct of the LIUNA internal reform program and, in particular, is familiar with all significant investigations, disciplinary actions, and trusteeships.  (Luskin Decl. ¶ 9.)  At no time during this period did the government find it necessary to file the consent decree provided for under the prior agreements. (*Id.*)  Furthermore, the United States and LIUNA have cooperated in efforts by the LIUNA Inspector General and

GEB Attorney to eliminate organized crime influence and other forms of corruption in LIUNA

through individual disciplinary actions and through trusteeships. (*Id.*) The United States has at no

time directed or controlled the efforts of the independent officers, but furnished such assistance as it

might lawfully provide in identifying corrupt individuals and entities. (*Id.*)

In the January 18, 2000 agreement with LIUNA, the United States explicitly affirmed "that

the Internal Reform Programs have been effective and have achieved substantial and significant

success in eliminating corrupting influence within LIUNA and ensuring that members of LIUNA

may freely and democratically participate in its affairs. . . ." *Agreement Between LIUNA and the United

States, dated January 18, 2000* at 2; (Luskin Decl. ¶ 10, Attachment B). Moreover, the Ethics and

Disciplinary Procedure, its adoption, and the integrity and independence of its processes and officers

have been affirmed in a number of federal courts including the United States District Court for the

Northern District of Illinois and the United States Court of Appeals for the Seventh Circuit. *Serpico

v. LIUNA*, Nos. 95C614, 94C1573, 95C1725, 1996 WL 41674, at *5, 151 L.R.R.M. (BNA) 2460

(N.D. Ill. Jan. 30, 1996), *aff'd*, 97 F.3d 995 (7th Cir. 1996); (Luskin Decl. ¶ 10).

Any interference with the LIUNA reform programs would undermine their efficacy and

subvert the rights of all union members. (Luskin Decl. ¶ 10.) It is particularly important to protect

the identity of individuals who have filed complaints with the Inspector General and GEB Attorney

because disclosure might expose these individuals to retaliation or even physical violence. (Luskin

Decl. ¶ 12.) Concerns for confidentiality are particularly acute with respect to investigations of

Defendant Construction and General Builders Laborers' Local 79 ("Local 79") in light of its past

history. (Luskin Decl. ¶ 13.) The Local itself, which is a constituent local within the Mason Tenders

District Council of Greater New York and Long Island, was created in the mid-1990's via a merger

of numerous other LIUNA local unions that were plagued by a longstanding and significant history of LCN domination.[1] (*Id.*)

It is for such reasons that the Third-Party Witnesses objected, under Federal Rule of Civil Procedure 45(c)(2)(B), to the subpoenas served upon them by Plaintiffs on November 7, 2005. (Luskin Decl. ¶¶ 15, 18; *see also* Plaintiffs' Motion to Compel, Ex. 2.)  In identical terms, each of the three subpoenas, which were returnable on December 7, 2005, call for the production of all documents relating to: (a) "all complaints regarding the hiring hall" at Local 79, from 1998 to the present; (b) "any investigations and their results regarding Local 79's hiring hall" for the same period; (c) "any investigations into cronyism, nepotism, or patronage at Local 79;" and (d) "the investigation and determination to place Local 79 under supervision." (Plaintiffs' Exhibit 1, Schedule A.)  This request essentially encompasses everything in the files of the GEB Attorney and Inspector General regarding Local 79, such as confidential complaints, witness interviews, reports and recommendations from the Inspector General to the GEB Attorney and related memoranda. (Luskin Decl. ¶ 15.)  Indeed, it is hard to imagine a request more sweeping or one that would more completely invade the confidential operations of the GEB Attorney and Inspector General.  It can hardly be doubted that disclosure of investigative interviews and reports would discourage individuals from reporting wrongdoing and, thus, would have a significantly harmful impact on the LIUNA reform process. (*Id.*)

---

[1] The details of Local 79's history are recounted in *Mason Tenders Local Union 59 v. LIUNA*, 924 F. Supp. 528 (S.D.N.Y. 1996) and *Mason Tenders Dist. Council v. LIUNA*, 884 F. Supp. 823 (S.D.N.Y. 1995). (See Luskin Decl. ¶ 13, Attachments C and D.)

## ARGUMENT

The GEB Attorney's duties under LIUNA's Ethics and Disciplinary Procedure require him to investigate and prosecute union corruption. In order to meet this obligation, the GEB Attorney must gather information from LIUNA members and other sources through confidential investigations that are conducted primarily by the Inspector General. Plaintiffs now propose to invade this confidential and highly sensitive relationship through a Motion to Compel that asks the Court essentially to cast aside basic work product and attorney-client privileges that are essential to the success of the GEB Attorney's office and, by extension, the LIUNA internal reform program. As explained more fully below, the work product doctrine and the attorney-client privilege exist precisely to prevent the type of disclosures that Plaintiffs now ask the Court to compel here. The Motion to Compel, therefore, must be dismissed.

### A.    THE WORK-PRODUCT DOCTRINE

The United States Supreme Court established the work-product doctrine over 50 years ago in *Hickman v. Taylor*, 329 U.S. 495, 516 (1947), to protect against a party's unfair use of "wits borrowed from the adversary." The doctrine, now codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure, shields from disclosure documents and tangible things created in anticipation of litigation. Fed. R. Civ. P. 26(b)(3); *see also*, Fed. R. Civ. P. 45(c)(3)(A)(iii) (requiring court to quash or modify subpoenas that seek "disclosure of privileged or other protected matter"). Documents protected under the work-product doctrine can be either "deliberative," sometimes called opinion work product, or factual in nature. *Hertzberg v. Veneman*, 273 F. Supp. 2d 67, 75 (D.D.C. 2003). In order to protect attorneys' mental impressions, conclusions, opinions or legal theories, there is a "nearly absolute privilege" for opinion work product. *Id.* A party can discover fact work product

only by showing: *first*, a substantial need; and *second*, the inability to obtain the substantial equivalent of the information by other means without undue hardship. *See id.* at 81; *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am*, No. Civ. 99-3298, 2004 WL 2009413, * 6 (D.D.C. May 17, 2004) (holding that discovering party must show no reasonable alternative source for same or substantially equivalent information); Fed. R. Civ. P. 26(b)(3).

Litigation need not be imminent in order for documents to be protected by the work product doctrine. *Hertzberg*, 273 F. Supp. 2d at 75. Under the law of this circuit, "at the very least some articulable claim likely to lead to litigation, must have arisen such that litigation was 'fairly foreseeable at the time the materials were prepared.'" *Id.* (quoting *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 865 (D.C. Cir. 1980)). In other words, the "primary motivating purpose behind the creation of a document or investigative report must be to aid in possible future litigation." *Janicker v. George Washington Univ.*, 94 F.R.D. 648, 650 (D.D.C. 1982). "[T]he 'testing question' for the work-product privilege... is whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998)(quoting *Senate of Puerto Rico ex rel. Judiciary Comm. v. United States DOJ*, 823 F.2d 574, 586 n. 42 (D.C. Cir. 1987)).

Significantly, the work product doctrine extends not only to documents created by attorneys, but also to materials created by agents of the attorney, including investigators. *Hertzberg*, 273 F. Supp. 2d at 75; *United States v. Nobles*, 422 U.S. 225, 238 (1975). Because the IG and his staff operate as agents of the GEB Attorney, their investigative materials, such as witness interviews, are fully protected by the work product doctrine. *See Massachusetts v. First Nat'l Supermarkets, Inc.*, 112 F.R.D. 149, 151 (D. Mass. 1986) (holding notes and memoranda of interviews conducted as part of an

8

internal investigation are protected work product if "they reveal the attorney's mental processes in evaluating . . . communications").

As courts have explained, the work-product doctrine exists because "'it is essential [to our adversarial system] that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel.'" *Willingham v. Ashcroft*, 228 F.R.D. 1, 3 (D.D.C. 2005) (quoting *Hickman*, 329 U.S. at 510-511). In addition, and more importantly for the continued viability of the LIUNA reform process, the IG's investigative materials are often gathered only with the assurances of complete confidentiality. "Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests . . . ." *United States v. Nixon*, 418 U.S. 683, 705 (1974).

In a union like LIUNA, and particularly Local 79, which have been dogged by the influence of organized crime, *see Mason Tenders Local Union 59*, 924 F. Supp. 528; *Mason Tenders Dist. Council*, 884 F. Supp. 823, it is critical that potential witnesses be able to say what they know without fear of retribution. (Luskin Decl. ¶ 17.) Disclosure of the IG's files would retroactively revoke the investigator's promise to protect the confidentiality of informants. (*Id.*) Only complete confidentiality of the investigation can protect witnesses and members of the union who are willing to provide information or otherwise cooperate with the reform process and, thus, ensure its integrity. *See Freeman v. Seligson*, 405 F.2d 1326, 1340 (D.C. Cir. 1968)("[W]here [a party] lacks subpoena power, the success of the investigation depends upon its ability to obtain the informant's voluntary cooperation . . . . [A]n identification of informational sources would seriously impair the effectiveness of the investigat[ion].")

In view of the case law set forth above, it is plain that Plaintiffs' sweeping discovery requests are precluded by *Hickman* and Rule 26(b)(3). Indeed, Plaintiffs seek production of all documents

relating to: every Local 79 job referral complaint, investigation and resolution from 1998 to the present; any investigations into what Plaintiffs nebulously characterize as "cronyism, nepotism, or patronage;" and the investigation that led to the placement of Local 79 under supervision by the International.[2] (Plaintiffs' Exhibit 1, Schedule A.)  To be sure, Plaintiffs essentially wish to compel everything in the files of the GEB Attorney and Inspector General regarding Local 79, including confidential complaints, witness interviews, reports and recommendations from the Inspector General to the GEB Attorney and related memoranda.

As a preliminary matter, there can be no question that all of the materials sought by Plaintiffs were prepared by the Inspector General and the GEB Attorney in anticipation of litigation.  Because the mandate of both offices is to root out union corruption, all investigations are conducted and supervised with an eye toward individual disciplinary action or the imposition of trusteeships or supervisions over union entities, all in accordance with authority granted under the LIUNA Ethics and Disciplinary Procedure.[3]  Apart from internal union litigation, aggrieved union members have the right to review in federal court and have exercised those rights in the past. *See* 29 U.S.C. § 412 (disciplinary actions), § 464 (trusteeships).  The GEB Attorney and IG take into account possible federal litigation whenever developing investigative materials.

Equally clear is that the materials sought by Plaintiffs, such as witness interviews, unquestionably would disclose the nature and scope of investigations and, thus, would directly reveal

---

[2] It is important to note that the request for documents relating to the imposition of a supervision over Local 79 is objectionable on relevance grounds as well.  That matter, which is covered in great detail by the LIUNA Independent Hearing Officer's memorandum opinion, was in no respects related to the local's job referral system, but instead, to the financial misconduct of various officers with respect to union vendors. (Luskin Decl. ¶ 14 and Attachment E.)  It, therefore, has no bearing on Plaintiffs' suit, which is focused entirely on the local's job referral system. (See Plaintiffs' Motion to Compel, Ex. 5, ¶ 1.)

[3] As it turns out, a recent investigation of Local 79 resulted in the imposition of a supervision over the local and led to the resignation of various officers. (Luskin Decl. ¶ 14.)

the theories and opinions of the GEB Attorney and IG regarding potential litigation. *See Upjohn Co. v United States*, 449 U.S. 383, 399 (1981) ("Forcing an attorney to disclose notes and memoranda of witnesses' oral statements is particularly disfavored because it tends to reveal the attorney's mental processes."). As previously mentioned, even a showing of "substantial need" and "undue hardship" is insufficient to overcome work-product protection over this type of opinion work-product. *See id.* at 401-02. As many courts have recognized, "[t]he detailed pattern of investigation and exploration in and of itself is not a proper subject for discovery."[4] *Massachusetts v First Nat'l Supermarkets*, 112 F.R.D. at 153 (quoting *Uinta Oil Ref. Co. v Continental Oil Co.*, 226 F. Supp. 495, 506 (D. Utah 1964)); *Board of Educ. of Evanston Township v Admiral Heating & Ventilating, Inc.*, 104 F.R.D. 23, 32 (N.D. Ill. 1984).

Indeed, the highest degree of protection is given to witness interviews. *See Upjohn*, 449 U.S. at 400; *United States v Paxson*, 861 F.2d 730, 736 (D.C. Cir. 1988). As the Supreme Court has explained: "The *Hickman* opinion drew special attention to the need for protecting an attorney against discovery of memoranda prepared from recollection of oral interviews." *Upjohn*, 449 U.S. at 400 (quoting Notes of Advisory Committee on 1970 Amendment to Rules, 28 U.S.C. App., p. 442); *Hickman*, 329 U.S. at 512 ("[A]s to oral statements made by witnesses to [counsel], whether presently in the form of his mental impressions or memoranda, we do not believe that any showing of necessity can be made under the circumstances of this case so as to justify production."). The D.C. Circuit requires a party to show "extraordinary justification" for the production of such material.

---

[4]  Furthermore, the compilation of various documents by the Third-Party Witnesses may constitute an attorney's opinion work product subject to protection under the work product doctrine. *See Willingham*, 228 F.R.D. at 6. Even if each individual document may be subject to discovery and may have already been produced, if counsel has selected portions of documents for certain purposes, courts have found that the identification of those documents would reveal the attorney's mental impressions and legal opinions. *See id.* Thus, compilations are also subject to the work product doctrine.

*Judicial Watch, Inc. v. United States Dep't of Commerce*, 196 F. Supp. 2d 1, 6 (D.D.C. 2001)(quoting

*Washington Bancorporation v. Said*, 145 F.R.D. 274, 276 (D.D.C. 1992)).

Not only is the substance of oral statements of witnesses protected, but the identification of

which witnesses were interviewed and when is also precluded.

> [T]o tell plaintiffs whom defendants have interviewed, where and when such interviews took place and whether or not a record was made - - is to give plaintiffs no more knowledge of substantive relevant facts, but rather to afford them the potential for significant insights into the defense lawyers' preparation of their case (and thus their mental processes).

*Board of Educ. of Evanston Township*, 104 F.R.D. at 32; *see also In re Ashworth Sec. Litig.*, 213 F.R.D. 385, 389 (S.D. Cal. 2002).

In the absence of any legal basis for the subpoenas at issue in this matter, Plaintiffs muster

only three arguments, none of which withstand scrutiny. Plaintiffs urge the Court to ignore the

Third-Party Witnesses' work product protection because, as Plaintiffs allege: (i) the materials were

not created in anticipation of litigation, but instead, in the "ordinary course of business;" (ii) the

protection was waived by a "consent decree;" and (iii) Plaintiffs have shown a "substantial need" for

the Third-Party Witnesses' work product. (Motion to Compel at 9-12.) The first two arguments are

frivolous; Plaintiff makes no effort to support the third.

As explained above, all of the materials sought by Plaintiffs were prepared in anticipation of

litigation because the mandate of both the GEB Attorney and the Inspector General is to root out

union corruption, which is accomplished substantially through litigation. All investigations,

therefore, are inherently conducted and supervised "to aid in possible future litigation." *Janicker*, 94

F.R.D. at 650. The litigation in this context includes individual disciplinary actions, trusteeships or

supervisions under the Ethics and Disciplinary Procedure, or appeals to federal court. It is

impossible to equate such materials with the type of administrative files maintained by an

organization in the ordinary course of business. The most that could be said for Plaintiffs' argument is that litigation *is* the ordinary course of business for the GEB Attorney and the Inspector General.

Faced with such unquestionably protected material, Plaintiffs concoct a waiver argument based on a "consent decree" that never took effect. Under the terms of the agreement entered into between LIUNA and the United States, the Department of Justice reviewed LIUNA's process and formerly had the authority to require the imposition of a judicial consent decree if LIUNA failed to make satisfactory progress in eliminating corruption. (Luskin Decl. ¶ 7.) At no time did the government find it necessary to impose the consent decree. (Luskin Decl. ¶¶ 8, 9.) Indeed, in 2000, the government surrendered that authority in light of LIUNA's successful efforts to purge the Union of organized crime influence. (Luskin Decl. ¶ 8.) Consequently, Plaintiffs' waiver argument, which rests entirely on language contained in the unexecuted consent decree, is wholly without foundation.

Plaintiffs are, therefore, left only to paraphrase the terms of the federal rule – that they have a "substantial need" and cannot obtain substantially equivalent information from any other source – yet fail to offer any specific demonstration of such need or undue hardship in obtaining substantially equivalent materials. Plaintiffs beg the question perhaps because the opposite is true. Indeed, under the explicit terms of the LIUNA job referral rules, all union members, such as Plaintiffs, are entitled to examine and copy a local union's job referral records. (Plaintiffs' Exhibit 3 at 15) (Sections 6 and 7 of the LIUNA Job Referral Rules). These records ordinarily form the core of the Inspector General's investigations and are supplemented with further interviews of union members all of whom presumably could be interviewed or deposed by Plaintiffs themselves in this case. In light of the fact that Plaintiffs have access already to the substantial equivalent of what they seek to compel from the Third-Party Witnesses it is clear that the purpose of the subpoenas is to obtain opinion

work product and to save Plaintiffs the normal time and expense of acquiring civil discovery.[5] This
is precisely what the work product doctrine forbids.

Because there is absolutely no basis upon which to compel the disclosure of the information
sought in Plaintiffs' subpoenas, the Third-Party Witnesses respectfully request that the Court deny
Plaintiffs' Motion to Compel.

## B.    THE ATTORNEY-CLIENT PRIVILEGE

Plaintiffs' Motion to Compel likewise runs afoul of the attorney-client privilege, which is
"the oldest of the privileges for confidential communications known to the common law," and
exists to protect "the giving of information to the lawyer to enable him to give sound and informed
advice." *Upjohn*, 449 U.S. at 389-391; *see also SEC v. Gulf & Western Indus., Inc.*, 518 F. Supp. 675, 680
(D.D.C. 1981). The privilege is intended to "encourage full and frank communication between
attorneys and their clients... [because] sound legal advice or advocacy serves public ends and ... such
advice or advocacy depends upon the lawyer's being fully informed by the client." *Cobell v. Norton*,
377 F. Supp. 2d 4, 9 (D.D.C. 2005) (quoting *Upjohn*, 449 U.S. at 389).

As with the work product doctrine, the attorney-client privilege covers investigative materials
gathered by the IG as an agent of the GEB Attorney. *See Massachusetts v. First Nat'l Supermarkets, Inc.*,
112 F.R.D. at 151 (holding notes and memoranda of interviews conducted as part of internal
investigation are protected by attorney-client privilege if they reveal communications); *see also United
States v. Davis*, 131 F.R.D. 391, 404 (S.D.N.Y. 1990) (citing *Upjohn*, 449 U.S. at 390-91, and holding
that communications to attorneys or the attorneys' agents are privileged). The Supreme Court noted

---

[5] Plaintiffs' request for disclosure, at best, amounts to a desire to have corroborating evidence, which is an insufficient
justification for such disclosure. *See Director, Office of Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304, 1308 (D.C.
Cir. 1997) ("By definition, a party seeking corroborative evidence has already found a way to get the same
information.").

14

in *Upjohn* that "[t]he first step in the resolution of any legal problem is ascertaining the factual

background and sifting through the facts with an eye to the legally relevant." *Upjohn*, 449 U.S. at 390-

391. It follows that investigation is, therefore, a central role for counsel and is protected by the

attorney-client privilege.

> Generally, the attorney-client privilege applies if the following conditions are met:
>
> (1) the asserted holder of the privilege is or sought to become a client;
>
> (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer;
>
> (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion of law or (ii) legal services or (iii) assistance in some legal proceeding; and not (d) for the purpose of committing a crime or tort, and
>
> (4) the privilege has been (a) claimed and (b) not waived by the client.

*See SEC v. Gulf & Western Indus., Inc.*, 518 F. Supp. at 681.

Each of these elements exists here to bring the information sought by Plaintiffs within the

protection of the attorney-client privilege. As previously discussed, the GEB Attorney was hired by

LIUNA in 1995 to investigate allegations of corruption and to bring trusteeship complaints and

disciplinary actions. The GEB Attorney, therefore, has an attorney-client relationship with LIUNA

and its members on whose behalf the GEB Attorney works. Investigators from the IG's office

obtain statements and make reports directly to the GEB Attorney to enable the GEB attorney to

perform the legal work for LIUNA that he was hired to do. The process is a confidential one, in

which communications to and from LIUNA members are not disseminated publicly. Because the

discovery sought in this case involves such confidential communications, whether to or from the IG,

the GEB Attorney, or the Case Administrator, that information is protected under the attorney-client privilege.

Plaintiffs nevertheless attempt to argue that the GEB Attorney does not have an attorney-client relationship with LIUNA. The Plaintiffs rest their argument, however, on two cases involving counsel positions that were entirely different from that held by the GEB Attorney. In *SEC v. Canadian Javelin*, 451 F. Supp. 594 (D.D.C. 1978), defendants were required to appoint a special compliance counsel as part of an SEC injunction that specifically emphasized that the special counsel would have no business or professional relationship with defendant except for those duties listed in the injunction. In the other case, *Osternick v. E.T. Barwick Indus.*, 82 F.R.D. 81, 82 (N.D. Ga. 1979), a special counsel was created under a Consent and Undertaking between the defendant and the SEC not to provide legal advice to the defendant, but to furnish a report to the SEC. Significantly, both of these cases involved discovery requests by the SEC, the actual party to the consent decrees, as opposed to the case presently before this Court in which the request comes from a party with no connection to the earlier agreements.

Plaintiffs point to nothing in the creation or operation of the GEB Attorney office that could lead one to doubt the existence of an attorney-client relationship between the GEB Attorney and LIUNA. Instead, Plaintiffs glibly argue that the GEB Attorney "was forced upon LIUNA by the Justice Department;" that the GEB Attorney publishes periodic reports in the union's magazine; and that the LIUNA General Counsel already serves "the traditional role of counsel." (Motion to Compel at 7.) Plaintiffs fail to explain how any of these points, even if accepted as true, undermine the attorney-client privilege claim. Even if one concedes that the government "forced" LIUNA to retain the GEB Attorney, Plaintiffs do not distinguish that situation from any other legal predicament in which circumstances compel an entity to establish an attorney-client relationship by

16

retaining counsel to resolve its legal problem. With respect to the GEB Attorney's reports, those publications contain no confidential information, but instead, only provide brief announcements regarding the commencement and the conclusion of internal union litigation, along with occasional explanations of union policies or rule changes. (Luskin Decl. ¶ 4; Attachment A.) Finally, there is nothing in either logic or law that precludes a client from retaining multiple attorneys for different or similar purposes. Here, the attorney-client relationship between LIUNA and its General Counsel does not vitiate the confidential relationship that LIUNA has established with the GEB Attorney. Consequently, Plaintiffs offer no legal or factual basis upon which to invade that relationship. The Motion to Compel, therefore, must be dismissed also on the grounds that it seeks information protected by the attorney-client privilege.

## CONCLUSION

The discovery sought in this case is protected both by the work-product doctrine and the attorney-client privilege. Moreover, public disclosure of the information sought by Plaintiffs would jeopardize the continued success of the LIUNA internal reform process and pose a threat to union members who have cooperated with internal union investigations. For all of the reasons mentioned above, the Third-Party Witnesses respectfully request that the Court deny Plaintiffs' Motion to Compel.

Respectfully submitted,

Robert D. Luskin (D.C. Bar # 293621)
PATTON BOGGS LLP
2550 M Street NW
Washington, DC 20037
(202) 457-6190
(202) 833-1971 Facsimile

Attorney for the LIUNA GEB Attorney,
Douglas Gow and Kendall Ludwig

Dated: February 2, 2006