924 F.Supp. 528, Mason Tenders Local Union 59 v. Laborers' Intern. Union of North America, AFL-CIO, (S.D.N.Y. 1996)                    Page 1

**\*528  924 F.Supp. 528**

**152 L.R.R.M. (BNA) 2212**

United States District Court,
S.D. New York.

**MASON TENDERS LOCAL UNION 59, Plaintiff,**
v.
**LABORERS' INTERNATIONAL UNION OF
NORTH AMERICA and Steve
Hammond, Defendants.**
**LABORERS' INTERNATIONAL UNION OF
NORTH AMERICA, AFL-CIO,**
**Mason Tenders District Council of Greater New
York, and Steve Hammond, Plaintiffs,**
v.
**LOCAL 23, Local 46, Local 48, Local 59, and
Locals A-C,**
**affiliated with the Laborers' International Union
of North**
**America, AFL-CIO;  Joseph Giardina, Business
Manager of**
**Local 23;  Joseph Luciano, Business Manager of
Local 46;**
**Anthony Zambordi, Business Manager of Local
48;  Michael**
**Perrone, Business Manager of Local 59 and
Business Managers**
**of Locals A-C, Defendants.**
**MASON TENDERS' UNION LOCAL 23 OF the
LABORERS' INTERNATIONAL**
**UNION OF NORTH AMERICA and Lawrence P.
Giardina,**
**individually and as President of Local
23, Plaintiffs,**
v.
**LABORERS' INTERNATIONAL UNION OF
NORTH AMERICA (LIUNA),**
**Mason Tenders District Council of Greater New
York, Steve**
**Hammond, in his official capacity as LIUNA
Trustee of the**
**Mason Tenders District Council of Greater New
York, Richard**
**Ello, in his official capacity as Office Manager and
Comptroller of the Mason Tenders District
Council of Greater**
**New York, Arthur A. Coia, in his official capacity
as**
**General President of LIUNA, Rollin P. Vinall, in
his**
**official capacity as General Secretary-Treasurer
of LIUNA,**

**and the General Executive Board of the Laborers'
International Union of North America, in their
official
capacity, Defendants.**
**Nos. 96 Civ. 2406(RWS), 96 Civ. 2417(RWS) and
96 Civ.
2544(RWS).**
May 2, 1996.

Local unions brought two separate actions against international union, international union's district council for metropolitan area, district council's trustee and international union officials, seeking to enjoin international union from implementing reorganization plan which would consolidate ten local unions into two newly chartered unions. International union, district council and district council's trustee brought action against local unions and local union officials to enforce implementation of reorganization plan.  Local unions and international union moved for preliminary injunction.  The District Court, Sweet, J., held that: (1) local unions would suffer irreparable harm from implementation of reorganization plan;  (2) international union would suffer irreparable harm if local unions were not required to obey order implementing reorganization plan;  (3) international union's determination that its adoption of reorganization plan did not violate its constitution was not patently unreasonable;  and (4) local unions failed to establish that international union adopted reorganization plan in bad faith.

Ordered accordingly.

West Headnotes

[1] Injunction ⟐⟐138.1
  212 ----
    212IV Preliminary and Interlocutory Injunctions
    212IV(A) Grounds and Proceedings to Procure
    212IV(A)2 Grounds and Objections
    212k138.1 In General.
  Standard for granting preliminary injunction is showing of irreparable injury, and either likelihood of success on merits or sufficiently serious questions going to merits to make them fair ground for litigation and balance of hardships tipping in favor of movant.

[2] Injunction ⟐⟐138.6
  212 ----
    212IV Preliminary and Interlocutory Injunctions

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

Luskin Declaration
Attachment C

924 F.Supp. 528, Mason Tenders Local Union 59 v. Laborers' Intern. Union of North America, AFL-CIO, (S.D.N.Y. 1996)                                                                      **Page 2**

212IV(A) Grounds and Proceedings to Procure
212IV(A)2 Grounds and Objections
212k138.6 Nature and Extent of Injury; Irreparable Injury.

Showing of irreparable harm is perhaps single most important prerequisite for issuance of preliminary injunction.

[3] Injunction ☜138.6
212 ----
212IV Preliminary and Interlocutory Injunctions
212IV(A) Grounds and Proceedings to Procure
212IV(A)2 Grounds and Objections
212k138.6 Nature and Extent of Injury; Irreparable Injury.

Necessary showing of irreparable injury for granting of preliminary injunction requires showing that irreparable damages are likely, not merely possible.

[4] Labor Relations ☜148
232A ----
232AIII Labor Organizations
232Ak141 Superior, Subordinate, and Federated Bodies
232Ak148 Judicial Interference in General.

Local unions would suffer irreparable harm from international union's implementation of reorganization plan which would consolidate ten local unions into two newly-chartered local unions, for purposes of determining local unions' entitlement to preliminary injunction enjoining implementation of such plan, where reorganization plan entailed revocation of local unions' charters, dispersal of local unions' membership, removal of local unions' elected officials from office, confiscation of local unions' assets and elimination of local unions' ability to elect and send delegates to annual convention which would hear appeal from reorganization plan.

[5] Labor Relations ☜148
232A ----
232AIII Labor Organizations
232Ak141 Superior, Subordinate, and Federated Bodies
232Ak148 Judicial Interference in General.

International union would suffer irreparable harm if local unions were not required to obey its order implementing reorganization plan which consolidated ten local unions into two newly-chartered local unions, for purposes of determining international union's entitlement to preliminary

injunction enforcing implementation of such plan, as permitting local unions to disregard international union's directives deprived international union of its right to self-governance in enforcing its constitution and deprived international union and its members of benefits of reorganization plan.

[6] Labor Relations ☜90.1
232A ----
232AIII Labor Organizations
232Ak90 Constitutions, By-Laws and Rules
232Ak90.1 In General.

Union's interpretation of its own constitution is entitled to great deference and will be upheld unless patently unreasonable.

[7] Labor Relations ☜90.1
232A ----
232AIII Labor Organizations
232Ak90 Constitutions, By-Laws and Rules
232Ak90.1 In General.

[See headnote text below]

[7] Labor Relations ☜137
232A ----
232AIII Labor Organizations
232Ak135 Judicial Interference with Internal Affairs
232Ak137 Constitution, By-Laws, and Rules.

Court may override union's interpretation of its own constitution that was made in bad faith.

[8] Labor Relations ☜141.1
232A ----
232AIII Labor Organizations
232Ak141 Superior, Subordinate, and Federated Bodies
232Ak141.1 In General.

International union's determination that its adoption of reorganization plan consolidating ten local unions into two newly-chartered local unions did not violate provision of its constitution requiring international union to act in its members' best interest was not patently unreasonable, despite local unions' contention that implementation of such plan would dilute members' access to their elected representatives, limit members' employment opportunities and result in loss of experienced business managers, as international union found that members would benefit from reorganization plan in that it would help eliminate organized crime in local

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

924 F.Supp. 528, Mason Tenders Local Union 59 v. Laborers' Intern. Union of North America, AFL-CIO, (S.D.N.Y. 1996)    **Page 3**

unions and permit improved enforcement of collective bargaining agreements, improved oversight of shop stewards, improved member transfer rights and more accurate recordkeeping.

[9] Labor Relations ⬥⇒141.1
   232A ----
      232AIII Labor Organizations
         232Ak141 Superior, Subordinate, and Federated Bodies
         232Ak141.1 In General.


[See headnote text below]


[9] Labor Relations ⬥⇒142
   232A ----
      232AIII Labor Organizations
         232Ak141 Superior, Subordinate, and Federated Bodies
      **\*528**  232Ak142 Rights as Between Affiliate and General Organization.

International union's determination that its adoption of reorganization plan consolidating ten local unions into two newly-chartered local unions did not violate provision of its constitution requiring that local unions be given opportunity to appeal was not patently unreasonable, though affected local unions would have no institutional representation at annual convention which would hear appeal, where members of two newly-chartered unions would be permitted to elect and send delegates to such convention.

[10] Labor Relations ⬥⇒141.1
   232A ----
      232AIII Labor Organizations
         232Ak141 Superior, Subordinate, and Federated Bodies
         232Ak141.1 In General.


[See headnote text below]


[10] Labor Relations ⬥⇒142
   232A ----
      232AIII Labor Organizations
         232Ak141 Superior, Subordinate, and Federated Bodies
         232Ak142 Rights as Between Affiliate and General Organization.

International union's adoption of reorganization plan consolidating ten local unions into two newly-chartered local unions did not violate procedural

provisions for consolidation under international union's constitution, though local unions did not receive details of the plan until day of hearing, local unions were unable to cross-examine witnesses during hearing and counsel was excluded from hearing, as only constitutional requirement was notice and hearing, local unions were provided notice of hearing at least 14 days prior to its commencement, and hearing was conducted in manner that provided all parties at least some opportunity to be heard.

[11] Labor Relations ⬥⇒141.1
   232A ----
      232AIII Labor Organizations
         232Ak141 Superior, Subordinate, and Federated Bodies
         232Ak141.1 In General.

Internal union hearings are not held to standards applicable to judicial proceedings and are not required to provide full panoply of procedural protections associated with judicial proceedings such as right to be represented by counsel and technical rules of pleading, procedure and evidence.

[12] Labor Relations ⬥⇒141.1
   232A ----
      232AIII Labor Organizations
         232Ak141 Superior, Subordinate, and Federated Bodies
         232Ak141.1 In General.


[See headnote text below]


[12] Labor Relations ⬥⇒142
   232A ----
      232AIII Labor Organizations
         232Ak141 Superior, Subordinate, and Federated Bodies
         232Ak142 Rights as Between Affiliate and General Organization.

Local unions failed to establish that international union adopted reorganization plan, which would consolidate ten local unions into two newly-chartered local unions, in bad faith, despite local unions' contentions that implementation of plan was not in best interests of members, that adoption of plan was procedurally deficient and that plan was pretext intended to achieve results of extending trusteeship and disciplining local union officers without following requirements of LMRDA, as international union found that members would

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

benefit from reorganization plan in that it would help eliminate organized crime in local unions and permit improved oversight of shop stewards, improved member transfer rights and more accurate recordkeeping, local unions were provided with notice and hearing, and reorganization plan did not provide for international union's ongoing supervision of two new local unions. Labor-Management Reporting and Disclosure Act of 1959, § 304, 29 U.S.C.A. § 464.

*530 D'Amato & Lynch (Michael K. Rappaport, of counsel), New York City, Lewis & Fiore (David L. Lewis, of counsel), New York City, for Mason Tenders' Local Union 23 and Lawrence P. Giardina.

Curtis, Mallet-Prevost, Colt & Mosle (Peter Fleming, Jr., of counsel), New York City, for Mason Tenders' Local Union 59.

*531 Cohen, Weiss and Simon (Richard N. Gilberg, Nathaniel K. Charny, of counsel), New York City, for Laborers' International Union of North America, AFL-CIO, Mason Tenders' District Council of Greater New York, and Steve Hammond.

### OPINION

SWEET, District Judge.

Mason Tenders Local Union 59 ("Local 59") has filed an action ("the Local 59 Action") and moved by order to show cause for a preliminary injunction pursuant to Rule 65, Fed.R.Civ.P., preventing Laborers' International Union of North America, AFL-CIO ("LIUNA") and Steven Hammond, as Trustee of the Mason Tenders District Council from revoking the charters and seizing the assets of Local 59 pursuant to a Reorganization Plan (the "Reorganization Plan" or "the Plan") approved by LIUNA's General Executive Board ("GEB"). Mason Tenders Local Union 23 ("Local 23") has filed an action ("the Local 23 Action") and a motion seeking the same relief with respect to Local 23.

In a separate action ("the LIUNA action") seeking to implement the Reorganization Plan, LIUNA has moved by order to show cause for a preliminary injunction under Rule 65, Fed.R.Civ.P., pursuant to which the charters of ten local unions, including

Local 59 and Local 23, are to be revoked.

Upon the findings and conclusions set forth below, Local 59 and Local 23 are denied injunctive relief, and LIUNA's motion to enforce the Plan is granted.

### Parties

LIUNA is a national labor organization headquartered in Washington, D.C. that oversees the operations of various local unions and district councils. LIUNA is a Plaintiff in the LIUNA action, and a Defendant in the Local 59 Action and the Local 23 Action. The General Executive Board ("GEB") of LIUNA is the governing body of the international union and a Defendant in the Local 23 Action.

Mason Tenders' District Council of Greater New York (the "District Council") is chartered by LIUNA to oversee the operations of its twelve constituent locals in the New York City Metropolitan Area. The District Council is a Plaintiff in the LIUNA action, and a Defendant in the Local 23 Action.

Steven Hammond ("Hammond" or "the Trustee") is the Trustee of the District Council. Hammond is a Plaintiff in the LIUNA Action, and a Defendant in the Local 59 Action and the Local 23 Action. Hammond was appointed on November 3, 1995 to succeed David Elbaor as Trustee by Arthur A. Coia ("Coia"), the General President of LIUNA and a Defendant in the Local 23 Action.

Local 23, Local 59, Local 46 and Local 48 (collectively, "the Locals" or "the affected Locals") are unincorporated associations and Mason Tenders Local Unions chartered by LIUNA. All are defendants in the LIUNA Action; Local 23 is a Plaintiff in the Local 23 Action; and Local 59 is a Plaintiff in the Local 59 Action.

Also Defendants in the LIUNA Action are Joseph Giardina, Business Manager of Local 23; Joseph Luciano, Business Manager of Local 46; Anthony Zambordi, Business Manager of Local 48; and Michael Perrone, Business Manager of Local 59. Joseph Giardina is also a Plaintiff in the Local 23 Action.

Richard Ello, Office Manager and Comptroller of

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

924 F.Supp. 528, Mason Tenders Local Union 59 v. Laborers' Intern. Union of North America,      **Page 5**
AFL-CIO, (S.D.N.Y. 1996)

the District Council, and Rollin P. Vinall, General Secretary-Treasurer of LIUNA, are Defendants in the Local 23 Action.

### Prior Proceedings

The three instant actions were filed on April 4, 1996 and April 10, 1996, and assigned to this Court based on their relation to *United States v. Mason Tenders District Council,* 94 Civ. 6487 (the "Civil RICO Action"), a civil RICO action filed on September 8, 1994.

On November 9, 1994, Coia proposed and the GEB approved the imposition of a temporary trusteeship on the District Council, the appointment of David Elbaor ("Elbaor") as temporary Trustee, and the appointment of Hammond as Deputy Trustee. On behalf of the District Council, Elbaor entered a consent decree on December 27, 1994 (the "Consent Decree") regarding the Civil RICO Action.

The GEB ratified the imposition of the trusteeship on January 17, 1995. On April **\*532** 17, 1995, this Court, while finding that the GEB did not meet certain procedural requirements for the imposition of an emergency trusteeship, held that the trusteeship was ultimately imposed legally and affirmed its validity. *Mason Tenders Dist. Council of Greater New York v. LIUNA,* 884 F.Supp. 823 (S.D.N.Y.1995).

On November 3, 1995, Hammond was appointed to succeed Elbaor as Trustee. On January 9, 1996, Hammond submitted a proposal to reorganize the District Council's constituent Locals ("the Reorganization Proposal") to Coia and Consent Decree Monitor Lawrence Pedowitz. Hammond proposed the consolidation of District Council Local Unions 13, 23, 33, 37, 46, 47, 48, 51, 59 and 104 into two newly-chartered local unions with exclusive craft jurisdictions.

Hammond presented the Reorganization Proposal to the GEB on January 29, 1996. The GEB appointed the Hearings Panel to conduct a hearing to consider the merits of the Proposal. At the Hearing, conducted on February 14-16, 1996, the affected Locals, as well as Hammond, made statements and submitted evidence in favor of and opposed to the Reorganization Proposal.

On April 1, 1996, the Hearings Panel issued its recommendation that Hammond's Reorganization Proposal be adopted in its entirety by the GEB, and the GEB voted to adopt the Hearing Panel's recommendation and implement the Reorganization Proposal immediately. On April 4, 1996, LIUNA officials advised the affected Locals that the GEB had adopted the Reorganization Plan and that it was effective immediately. The same day, Hammond attempted to implement the GEB's order to revoke the charters of the Locals and transfer their assets and property to LIUNA.

Six of the ten Locals complied. The remaining four affected Locals (Locals 23, 46, 48, and 59) refused to turn over their premises to the LIUNA deputies. Local 59 filed an action in this Court on April 4, 1996, alleging that the Reorganization Plan was approved in violation of LIUNA's Constitution and the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), and seeking to enjoin LIUNA and the GEB from implementing the consolidation. LIUNA also filed an action on April 4, 1996, seeking to enforce the implementation of the Reorganization Plan. On April 10, 1996, Local 23 filed an action seeking to enjoin implementation of the Plan. Although no formal order of consolidation has been entered, the hearing on injunctive relief in all three cases was consolidated.

On April 4, 1996, this Court issued a temporary restraining order enjoining the immediate implementation of the Reorganization Plan with respect to the Locals which had not yet complied, but allowing LIUNA representatives access to those Locals' premises, books and records pending this Court's resolution of the parties' motions for injunctive relief.

On April 15 and 16, 1996, this Court held an evidentiary hearing on the parties' pending applications for preliminary relief. At that hearing, counsel for Local 59 represented to the Court that Local 46 and Local 48 sought to be included as parties in the instant proceedings. The Court granted that informal request, but no formal application has been made regarding the inclusion of Locals 46 and 48 as parties. On April 16, 1996, at the close of the hearing, this Court extended the previously issued temporary restraining order until April 26, 1996. The parties presented final

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

arguments and post-hearing memoranda to the Court on April 25, 1996, at which time the motions were considered finally submitted, and the temporary restraint was extended until May 3, 1996.

## FACTS

### Union Structure and Governance

LIUNA is an international labor organization representing laborers in the United States and Canada. Pursuant to LIUNA's Constitution, the International Union Constitution ("IUC"), LIUNA has authority over all aspects of the operation and control of the activities of LIUNA's subordinate bodies. IUC Art. II, § 2. LIUNA's supreme authority resides in the Convention, an assembly of delegates from each local union chosen by its members. IUC Art. I, § 2. The convention this year will take place in September. Subject to review by the Convention, the GEB of **\*533** LIUNA exercises the executive and judicial powers of LIUNA during the interim periods between Conventions. IUC Art. I, § 2. Individual members, locals and district councils have the right to appeal the acts of the GEB to the Convention. It is anticipated that Coia, LIUNA's General President, will appoint a committee to hear appeals and recommend action to the Convention with respect to those appeals.

District councils, such as the Mason Tenders District Council, are the intermediate organizations between LIUNA and the local unions affiliated with LIUNA, and operate under the Uniform District Council Constitution ("UDCC"), as amended by the LIUNA Convention in 1991. The district councils are chartered by LIUNA to maintain uniformity, establish coordination, and avoid competition among local unions in metropolitan areas. Uniform District Council Constitution ("UDCC") Art. II, §§ 1(e)-(h). Under the UDCC, all local unions within the territorial jurisdiction of a district council must affiliate and remain affiliated with that district council. UDCC Art. I, § 2.

Prior to imposition of the trusteeship on the District Council of Greater New York by LIUNA, discussed below, the District Council was a body composed of thirty-nine delegates elected by and representing the twelve affiliated Locals in the New York metropolitan area. The District Council

engaged in collective bargaining with employers on behalf of the members of all but two of the Locals. The District Council also managed pension and health insurance funds for its members. (FN1)

The relationship between LIUNA and its local unions is governed by the IUC and the Uniform Local Union Constitution (herein "ULUC"), as amended by the LIUNA Convention in 1991. Both of these governing documents provide that the local unions are subordinate bodies to LIUNA and that LIUNA retains, at all times, full authority over the structure of the local unions and sole discretion to charter new local unions and revoke, suspend or amalgamate the charters of existing local unions. See IUC Art. II, § 2(b), Art. VII, §§ 2(f), 2(g); ULUC Art. II, § 3(d). The IUC specifically grants LIUNA broad authority to "issue charters to Local Unions, District Councils and other subordinate bodies; and to define their powers and crafts or territorial jurisdiction; to revise, amalgamate or revoke existing charters; and to govern, discipline, regulate or supervise these subordinate bodies ..." IUC Art. II, § 2(b).

Article VIII, Section 2 of the IUC likewise provides that the GEB has broad power to charter new local unions and to revoke, consolidate or amalgamate the charters of existing local unions. Specifically, IUC Article VIII, Sections 2(f) and 2(g) provide:

(f) [The GEB] shall have the authority to order the issuance of charters to Local Unions, District Councils or other subordinate bodies, specifying the territorial and craft jurisdiction to be allotted, when and where, in its opinion, the issuance of such charter would tend to accomplish, promote, enhance and conserve the welfare and interest of th[e] International Union, its affiliates and members.

(g) Upon notice and after hearing, [the GEB] shall have the authority to revoke, consolidate or amalgamate the charters of the Local Unions, District Councils, or other subordinate bodies and to define or revise their craft or territorial jurisdiction.

IUC Article XVIII sets out the obligations of affiliates, such as the Locals, to LIUNA and further establishes the subordinate nature of the Locals to

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

924 F.Supp. 528, Mason Tenders Local Union 59 v. Laborers' Intern. Union of North America, AFL-CIO, (S.D.N.Y. 1996)

the International. Section 1 provides that:

> Each affiliated Local Union and each affiliated District Council and the officers thereof, shall conform to and comply with all obligations as provided for in the Uniform Local Union Constitution and Uniform District Council Constitution.

IUC Art. XVIII, § 1. *See also* Art. XVIII, § 6 ("If a Local Union is suspended, dissolved or ceases to exist, all of its property, funds, books, papers and paraphernalia shall *534 immediately revert to and become the property of the International Union and the General President may forthwith, either personally or by deputy, take possession thereof for the International Union. Alternatively, the General President may, in his sole discretion, refrain from taking any or all of the form Local Union's property, funds, books, papers, or paraphernalia."). The ULUC mandates that all local unions "shall recognize and be subject to all of the provisions of the International Union Constitution," and "shall comply with all such rules, regulations, policies, practices and lawful orders and decisions of the International Union, its officers and General Executive Board ..." ULUC Art. II, § 3(b). The ULUC specifically grants LIUNA the authority to revoke or suspend a local union's charter:

> The General Executive Board of the International Union may, upon notice and after hearing, suspend or revoke charters or consolidate or amalgamate subordinate bodies and may define or revise their craft or territorial jurisdiction.

ULUC Art. II, § 3(d). *See also* ULUC Art. II, § 3(k) (upon dissolution, the property of the former local union becomes the property of the International).

Under the IUC, actions of the GEB must be complied with immediately by local unions. IUC Art. VIII, Section 2(a)(viii) provides that a "decision, direction, ruling, or order by the [GEB] on any matter, is final and binding until and unless it is reversed or modified by the following regular Convention." IUC Art. VIII, § 2(a)(viii).

Prior to the adoption of the Reorganization Plan by the GEB, the LIUNA members in the New York metropolitan area and Long Island, were organized in twelve Locals. The twelve Locals, Locals 13, 23, 30, 33, 37, 46, 47, 48, 51, 59, 66 and 104, exercised jurisdiction over asbestos abatement, demolition, total demolition, interior demolition, mason tenders, plasterer tenders and general building laborers in the New York City Metropolitan area and Long Island. In May of each year, each Local nominated candidates for its President, Secretary-Treasurer, Business Manager and Executive Committee and elected those officers each June. The twelve Locals' combined membership included approximately 6000 individuals, 1400 of whom were affiliated with Local 59 and 1300 of whom were affiliated with Local 23.

### The Trusteeship Imposed on the District Council

The facts relating to the imposition of the Trusteeship are set forth in the prior opinion of this Court, *Mason Tenders,* 884 F.Supp. at 827-29, familiarity with which is assumed. Only the facts necessary to the instant proceedings are set forth herein.

On September 8, 1994, the U.S. Government filed a complaint against the District Council (herein the "Civil RICO Complaint") alleging that the affairs of the District Council had been conducted through a pattern of racketeering with organized crime, in violation of 18 U.S.C. § 1962. *See Mason Tenders,* 884 F.Supp. at 827-29. The civil RICO suit sought the removal of the elected leaders of the District Council; control by the Government over the election of new officers; appointment of a special investigations officer with power to charge and prosecute union members suspected of wrongdoing; and appointment of a monitor to oversee the administration of the District Council and the management of the trust funds. *Id.*

On November 7, 1994, Coia received a copy of a second draft civil RICO complaint, this one prepared by the United States Attorney for the Northern District of Illinois, which sought to remove Coia from the presidency and take over LIUNA at the national level. On November 9, 1994, Coia proposed and the GEB approved, pursuant to the IUC, the imposition of a temporary trusteeship over the District Council and the appointment of David Elbaor as temporary Trustee. Although there is no direct evidence linking the two looming government actions to Coia's decision to

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

impose the Trusteeship, "[t]he record compels the inference that avoidance of his own prosecution was at least one motive for Coia's decision...." *Mason Tenders,* 884 F.Supp. at 828.

On November 15, 1994, Elbaor appeared at the office of the District Council and relieved the District Council's elected delegates and Executive Board of all duties and responsibilities.    **\*535** Shortly thereafter, on December 27, 1994, Elbaor executed a Consent Decree (the "Consent Decree") regarding the Civil RICO Complaint on behalf of the District Council. One of the purposes of the Consent Decree, which binds both the District Council and its constituent Locals, "is to end the [organized crime] involvement, directly or indirectly, in the District Council and its constituent Locals, and that all officers, members and employees of the District Council and its constituent local unions are to assist the officers appointed by the Court pursuant to th [e] Consent Decree to achieve this purpose." Consent Decree, p. 4. In addition, under the Consent Decree, *inter alia:* (1) a monitor was appointed with autonomous supervisory powers over the District Council; and (2) an investigations officer was appointed with authority to (i) investigate and prosecute misconduct in the District Council in conjunction with the monitor; (ii) to discipline, impose fines upon, and suspend or expel union members, officers, agents, representatives and employees under the procedures set forth in the Consent Decree; and (iii) to bring civil actions on behalf of the District Council to recover for damages. The Consent Decree also provides that the District Council has an obligation to keep the District Council and its constituent Locals free from the influence of organized crime and that the District Council must act in the best interests of its members. *Id.*

On January 17, 1995, the GEB ratified the imposition of the trusteeship over the District Council. On February 13, 1995, Coia and the GEB entered into an agreement with the government, as a result of which the government agreed, on at least a temporary basis, not to pursue the RICO charges against Coia and other defendants (the "February 1995 Agreement"). On April 17, 1995, this Court, while finding that the GEB did not meet certain procedural requirements for the imposition of the *emergency* trusteeship, held that the trusteeship was ultimately imposed legally and affirmed its validity.

*See Mason Tenders,* 884 F.Supp. at 835-36. In the course of the injunction hearing before this Court, it was announced that the trusteeship had been extended for an additional 18 months.

### The Government/LIUNA Agreement

The government announced on February 1, 1996 that the International had agreed, pursuant to that February 1995 Agreement, to institute significant electoral reforms designed to provide the free, fair, and democratic election of its General Officers for the first time since 1926. Specifically, LIUNA agreed to hold secret ballot elections by the rank-and-file members for the offices of General President and General Secretary-Treasurer later this year. Further, LIUNA agreed to expand the GEB to include the General President, the General Secretary-Treasurer, nine Vice Presidents to be elected by delegates from newly designated election districts, and four Vice Presidents-at-large to be elected by all Convention Delegates. In addition, the International agreed to the appointment of an independent elections officer to oversee the selection of delegates and the election of officers to the GEB.

### The Reorganization Plan and Its Adoption

During the summer of 1995, Elbaor's conduct as Trustee had been the subject of criticism. Hammond, as Deputy Trustee, prepared a memorandum to Elbaor dated September 7, 1995 ("the September 7 Memo," also referred to as the "smoking gun memo" in the patois of the hearing) describing the action that had been taken under the Consent Decree but stating: "In our attempt to rid the Locals of corruption, we find the following problems exist." Hammond then detailed various difficulties in the attempt, and cited the particular example of the removal of Joe Giardina as business manager of Local 23, and the lengthy procedures to be followed with respect to his replacement. Hammond noted: "With the amount of time it takes under the Consent Decree to investigate and charge an individual (at the extreme it will be 4-6 months, which can be appealed to the courts, which have no time restraints) it will be a very long time to charge and remove the business managers of the twelve Local Unions." The memorandum stated Hammond's belief that criminal elements controlled not only some union appointments, but contractors as well, and set forth the "need to consider radical

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

changes." Hammond *536 then proposed a restructuring which in large measure became the Reorganization Plan which is the subject of this proceeding. Hammond suggested that the initial cost of this action would be high, that it should be done all at once before the trusteeship expires, and that it will create a "shock wave" and that his memo should remain confidential. Hammond later characterized the memorandum as simply his preliminary thinking at the time.

In an interoffice memorandum of September 17, 1995 from Richard Luskin ("Luskin"), LIUNA's outside counsel, to Michael Bearse ("Bearse"), LIUNA's general counsel, Luskin reported on a meeting with counsel for the government in the Civil RICO action, the Court-Appointed Monitor and the Investigations Officer. The memorandum noted the criticism of Elbaor and the possibility of merger and consolidation, with respect to which Luskin noted "substantial input from Steve Hammond." Luskin also proposed that discussions be held with Carl Booker and Armand Sabitoni, members of the GEB. There is no evidence as to whether or not those discussions ever occurred. There is no direct evidence that Bearse shared the contents of Luskin's memorandum with Coia, but the nature of the subject matter is such that it is fair to infer that, at a minimum, Bearse informed Coia of the Plan.

On November 3, 1995, Hammond was appointed to succeed Elbaor as Trustee. When he was appointed as Trustee, Hammond had already concluded preliminarily in the September 7 Memo that the twelve-Local structure described above was organizationally and financially inefficient, and impeded compliance with the directives set out in the Consent Decree. On January 9, 1996, Hammond submitted to Coia and Decree Monitor Lawrence Pedowitz his Reorganization Proposal to consolidate the constituent Locals in the District Council. The Trustee proposed the consolidation of Local Unions 13, 23, 33, 37, 46, 47, 48, 51, 59 and 104, into two newly-chartered local unions with exclusive craft jurisdictions: (FN2)

· one general building laborers and mason tenders local union; and,

· one asbestos abatement and lead removal local union.

Hammond proposed that the District Council would be comprised of four local unions after reorganization:

(1) *General Laborers and Mason Tenders Local Union:* Mason tenders, demolition and general laborers for all such workers in the five boroughs of New York City;

(2) *Asbestos and Lead Removal Local Union:* Asbestos abatement and lead removal for all such workers in the five boroughs of New York City;

(3) *Plaster Tenders Local 30:* Plaster tenders for all such workers in the five boroughs of New York City; and

(4) *General Building Laborers and Mason Tenders Local 66:* All building work within Long Island.

In Hammond's view, the reorganization of ten District Council Locals into two newly-chartered local unions would allow for increased organizational and financial efficiency, and improved Consent Decree compliance. Hammond proposed to achieve this by replacing the ten Locals with overlapping jurisdictions and redundant administrative expenses with the four new locals, each with distinct and exclusive jurisdictions. Because of the history of the District Council, the Civil RICO Action and its Consent Decree, the Government has continued its interest in the affairs of the GEB, the District Council and the Locals. Indeed, the Government has submitted a letter to this Court in support of the Reorganization Plan, and the officers appointed under the Consent Decree participated *537 in the initial consideration of the Plan. On January 3, 1995, Hammond appointed two field representatives, Messrs. Silveri and Tammero, to seek out evidence of job site violations of the collective bargaining agreement, to document various job sites, and to report any job site violations to Hammond.

Hammond presented his Reorganization Proposal to the GEB at a meeting held on January 29, 1996. The GEB directed that a hearing be held pursuant to Article VIII, Section 2(g) of the IUC to consider the merits of the Proposal. Pursuant to IUC Article VIII, Section 2(a)(v), the GEB delegated its powers to conduct the hearing to a Hearings Panel of two GEB members, General Secretary-Treasurer Vinall

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

and Vice-President Jack Wilkinson.

By letter dated January 29, 1996, Vinall informed the Executive Board members of each of the affected Locals of Hammond's proposal and the upcoming Hearing. Affixed to Vinall's letter were a summary of the Reorganization Proposal and the Rules for the Hearing. The Locals did not receive the details of the Plan until February 14, 1996, the date the Hearing commenced.

At the Hearing on February 14-16, 1996, Hammond and the affected Locals made statements and submitted evidence in favor of or opposed to the Reorganization Proposal. Only members of the Locals were permitted to attend; counsel were excluded.

Hammond testified, and presented the testimony of five other witnesses, regarding three types of difficulties inherent in the former structure of the Locals: (1) organizational inefficiencies; (ii) financial waste; and (iii) difficulty in compliance with the Consent Decree.

Hammond stated: "[T]he existence of ten local unions with conflicting jurisdictions is the most significant hurdle to a vigorous and successful representation of our members within the Council.... I am speaking [ ] to the inevitable structural inefficiencies arising from ten separate local unions serving the identical membership." Hearing Transcript ("Tr.") I, pp. 55-56. *See also id.,* p. 56 ("A single, centralized local for each craft which does not spend time and resources fending off competing local unions for jurisdiction over jobs or fending off local unions which are not complying with LIUNA's constitutions and collective bargaining agreements, will be dramatically more effective.").

The evidence submitted to the Hearings Panel identified at least five types of organizational problems which would be improved or eliminated by implementation of the Reorganization Proposal, including: (1) overlapping jurisdictions and the competition among Locals, *see* Tr. I, pp. 47-48; 59-73 (evidence that significant jurisdictional disputes have existed in the District Council since 1960 and "jurisdictional conflicts continue to arise and to cause the expenditure of a great deal of time and of the Council's resources"); (2) contract

enforcement and administration, *see id.,* pp. 87-97 (important elements of the collective bargaining agreement are often ignored on the job sites, and having one local union per craft will "provide the people involved with the responsibility and understanding [of] who is in charge"); (3) problems with shop steward appointments, *see id.,* pp. 121-23, 129 (common instances of "absentee shop stewards," non-union workers under union shop steward, shop stewards unfamiliar with collective bargaining agreement, and appointment of shop stewards who are "favorites and friends of the local union business manager and are appointed all the time"); *id.,* pp. 134-135; pp. 123-124 (explaining why Reorganization Proposal would "be a great help in solving these problems with the shop steward[s]"); (4) member transfer rights, *see id.,* pp. 141-142 (members denied the right to transfer between Locals even when necessary to be eligible for work, but under the Reorganization Plan, "each LIUNA member would join the appropriate local for his or her craft and with few exceptions, questions of transfer will in fact become irrelevant."); and (5) record keeping. *See id.,* pp. 142-44 (inadequate and untimely steward reports, job notifications, and per capita tax reports; reorganization will facilitate better record keeping).

Hammond and Certified Public Accountant Gary Broder testified regarding the financial efficiencies of the Reorganization Proposal. Broder submitted three sets of reports to the **\*538** Hearing Panel, including a report, entitled "Comparison of Assembled Combined Statements of Operating Expenses and Projected Combined Statements of Operating Expenses," which shows a line-by-line comparison of the costs of operating under the current structure and the structure after the implementation of the proposed Reorganization Plan. As shown in Broder's report, payroll would be decreased from $2,148,341 to $575,000, a savings of $1,573,341. Similarly, general and administrative expenses would go from $734,001 under the current structure to $432,626 under the Reorganization Plan. The savings would result from the elimination of unnecessary duplicative spending on executive salaries and expenses, such as automobiles (some of which were luxury sedans), currently required by each of the twelve Locals. *See* Tr. II, p. 55 (The Proposal will allow for "better utiliz[ation]" of clerical staff and equipment). In conclusion, Broder projected that the Locals'

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

membership would see a savings of $2,812,385 if the Reorganization Proposal was implemented. *See* Tr. I, pp. 157, 176.

The Locals, however, demonstrated that the claims of increased financial efficiency under the Plan did not take into account the significant costs of hiring additional staff, such as field representatives, in order for the new local unions to operate effectively. Tr. II, p. 33-34. When such expenses are taken into account, the Plan offered little, if any, savings over the current structure. However, Hammond testified that expenditure on new field representatives would be more beneficial to the members than duplicative executive salaries and expenses. *Id.*

Court-Appointed Investigations Officer Michael Chertoff ("Chertoff") testified and submitted evidence regarding better Consent Decree compliance. *See* Tr. I, pp. 22, 33-51. (FN3) Chertoff summarized his view: "[T]he multiplicity of locals, the overlapping geographical jurisdictions, [and] the lack of centralized control over the appointment and training of shop stewards have contributed to situations in which those people who are inclined to take advantage have opportunities to take advantage." *Id.*, p. 36.

Chertoff discussed the division of District Council Locals among three organized crime families. *See* Tr. I, pp. 37-38. Chertoff explained that the number of Locals has become "one of the means [through] which organized crime families resolve their disputes over control of the union." *Id.* at p. 39. Although Chertoff testified that he does not think it was "intentionally" designed this way, "it has the effect of facilitating turf trading among organized crime families about who is going to control which job in which parts of the union." *Id.* at pp. 39-40.

Chertoff outlined four reasons why the Reorganization Plan would promote more effective Consent Decree compliance. First, the Plan would eliminate the ability of contractors to play one union off against the other and thereby undermine the requirement that the District Council operate for the benefit of its members. Tr. I, pp. 40-43, 49. Second, the Plan would allow for the easier flow of information between the Locals and the District Council. *Id.* at pp. 43-44, 49-50. Third, more

control over shop steward appointment, training, and monitoring would eliminate opportunities for abuse. *Id.* at pp. 44-47, 49. Fourth, the Proposal would not only place a limit on the amount of dues money spent on "officer benefits," but would also allow for a rational and consistent compensation system for the Locals' officers and staff. *Id.* at pp. 47-49.

Chertoff summarized: "All of these things would help our ability to promote the Consent Decree. To the extent we eliminate [these issues] there is going to be less temptation and there is going to be less need for us to go out and frankly find people in charge when they are not living up to their obligations." Tr. I, at pp. 49-50.

All of the affected Locals made presentations and submitted evidence to the Hearings Panel, some in favor of, but most in opposition to, the Reorganization Proposal. The constituent members of the Locals offered **\*539** testimony regarding: the talented people involved with the Locals, Tr. II, pp. 175, 214, 226, Tr. III, p. 21; the lack of proof of corruption and misconduct within the Locals, Tr. II, p. 205, 227-28; challenges to the procedural aspects of the Hearing, *id.*, pp. 67-69, 113-14, 193-94, Tr. III, pp. 27-28; the Trustee's ineffective leadership of the District Council, Tr. II, pp. 66-67, 116, 121, 138, 142-43, 177; and an argument that the multiplicity of Locals in the District Council aids in the fight against corruption in the District Council. *See,* for example, Tr. II, pp. 77-78.

Members of the Locals testified that implementation of the Reorganization Plan would actually harm the rank-and-file by diluting the members' access to their elected representatives, forcing members to choose between asbestos work and general construction, thus limiting their flexibility and employment opportunities, causing the loss of a wealth of experience which the current business managers possess concerning their members on the one hand, and employers on the other, and resulting in severe dislocation and loss of work opportunities for the members.

At the conclusion of the Hearing, all of the parties were afforded a three-week opportunity to submit additional evidence to the Hearings Panel and to submit post-hearing memoranda. Several of the affected Locals submitted additional evidence to the

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

924 F.Supp. 528, Mason Tenders Local Union 59 v. Laborers' Intern. Union of North America,    **Page 12**
AFL-CIO, (S.D.N.Y. 1996)

Hearings Panel during this period of time. In addition, Local Union 23, Local Union 59 and Hammond submitted post-hearing memoranda. Seven letters were submitted by members of the Locals to the GEB in favor of the consolidation, and 108 letters, as well as a petition containing 2171 signatures, were submitted in opposition.

On April 1, 1996, the Hearings Panel issued its report and recommendation regarding Hammond's Reorganization Proposal. In its six-page report, the Hearings Panel recommended that: "the Proposal for Reorganization submitted by Trustee Hammond be adopted, in its entirety, by the General Executive Board." Hearing Panel Report at p. 5. The sub-committee based this recommendation on fourteen paragraphs of findings, including:

· The District Council Local Unions have identical trade jurisdiction with ill-defined and overlapping geographic boundaries, [which] ... has fostered counterproductive competition among the Local Unions and needless waste of the District Council's time and resources in attempting to resolve jurisdictional conflicts among them.

· Under its current structure, the District Council has been unable effectively to administer and enforce compliance of collective bargaining agreements.

· Shop stewards appointed by competing business managers of Locals are often absent from their assigned job sites, unfamiliar with the collective bargaining agreement, and tolerate use of non-union employees, and it is difficult if not impossible for the District Council under its current structure to oversee and train shop stewards.

· Competing Local Unions in certain areas have denied each other's members the right to work on jobs in those areas, unnecessarily denying members job opportunities. Under the proposed reorganization, members would have the right to transfer back and forth freely between the two newly chartered unions, thereby increasing employment opportunities.

· In order for the District Council to serve as the collective bargaining agent for its constituent Locals, the District Council must receive prompt and accurate reports from shop stewards. The current

record-keeping problems should be alleviated by the proposed reorganization.

· In view of the overlapping craft and geographical jurisdictions of the Locals, expenditures amount to a redundant and unnecessary waste of members' dues. Although the District Council's operating expenses may increase following reorganization as it becomes necessary to hire additional field representatives or other staff, the Panel is persuaded that such additional funding, if it becomes necessary, will better serve the interests of the membership.

**\*540** · Testimony and evidence submitted by Court-Appointed Investigations Officer Michael Chertoff persuade the panel that organized crime has been able to maintain a strong foothold within the District Council and its Locals in part because of the current structure of the District Council.

The Hearings Panel concluded:

Based upon the foregoing, and upon careful consideration of what is in the best interests of LIUNA and its members, the Panel has determined that the current structure of the District Council is organizationally and financially inefficient and one which impedes the District Council's ability to monitor and enforce the Consent Decree. Furthermore, it is the Panel's conclusion that the reorganization proposal represents a rational, fair and effective approach to alleviating, if not substantially eradicating, these very serious problems. As a result, the District Council membership will benefit the most from the reorganization, in that the District Council will now be able to devote a greater portion of its time and resources to organizing non-union workers, creating job opportunities, and to securing a fair wage, better benefits, and safer working conditions ...

The Hearings Panel recommended that the GEB adopt the following procedure and plan:

That the charters of the ten local unions subject to consolidation under the reorganization be revoked, effective immediately.

That all the property, funds, books, papers and paraphernalia of the aforesaid Local Unions shall immediately revert to and become the property of

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

924 F.Supp. 528, Mason Tenders Local Union 59 v. Laborers' Intern. Union of North America,    **Page 13**
AFL-CIO, (S.D.N.Y. 1996)

the International Union, through its deputy, the District Council Trustee, to be apportioned among the two successor unions to be provisionally chartered.

That two new Local Unions be provisionally chartered effective immediately, with the jurisdictional and other characteristics set forth under the Proposal for Reorganization.

That the District Council Trustee be instructed to appoint provisional officers to fill the Executive Board of the two new Local Unions, to serve until a rank-and-file election of officers shall be held in May-June 1997.

That the good standing members of the ten Local Unions subject to consolidation shall be allowed to transfer into one or the other of the two new provisionally chartered Local Unions in accordance with the practices and procedures of the International Union.

That the General Executive Board recommend to the General President, subject to the approval of the Election Officer, that he exercise his constitutional authority to grant a variance from the provisions of Article V, Section 3 of the International Union Constitution, in order that each of the two new Local Unions shall conduct nominations and elections of delegates to the 1996 Convention.

*Id.* at pp. 5-6.

On April 1, 1996, the GEB voted to adopt the Hearings Panel's Report and Recommendation and to implement the Reorganization Proposal immediately. On April 4, 1996, General Secretary-Treasurer Vinall and General President Coia advised the affected Locals that the GEB had adopted the Reorganization Plan and that it was effective immediately. At that time, the Locals were provided copies of the Hearings Panel Report and Recommendation, and letters from Coia and Vinall.

On April 4, 1996, Hammond appointed a series of deputies to effectuate the GEB's order and directive regarding the revocation of the charters of the former District Council Locals and the transfer of assets and property of the affected Locals to the District Council. Hammond secured compliance

from six of the ten former Locals but was unable to secure compliance from Local Unions 23, 46, 48, and 59.

On April 8, 1996, Hammond appointed the members of the executive boards of the two newly-chartered local unions. On April 10, 1996, these executive board members were sworn in and took office. Approximately 60% of those newly appointed officials were previously board members of former Locals whose charters were revoked pursuant to the Reorganization Plan.

*\*541 The Evidence Presented With Respect to the Plan*

The evidence presented to the Hearings Panel has been set forth above, and, of course, was submitted to the Court upon the instant hearing regarding injunctive relief. In addition, Hammond and Silveri testified at the injunction hearing as to approximately a dozen instances of confusion resulting from overlapping jurisdiction. Hearsay evidence was also submitted with respect to jobs not properly documented, shop stewards not properly appointed, and the Local's failure to ensure that union members were employed in particular jobs. However, as to the presence of non-union workers, no further investigation had been conducted with respect to the seven-day rule which permits hiring non-union workers provided they enroll in the union within the specified time. In short, there was hearsay evidence, though not overwhelming, concerning the practices related to the Hearings Panel. Neither the Trustee nor Silveri kept records with respect to the instances about which they testified. Finally, no direct evidence was adduced with respect to any criminal activity.

*Effect of the Reorganization Plan*

Implementation of the Reorganization Plan will result in the revocation of the charters of the affected Locals, the transfer of their assets, the dismissal of their elected officials, and the end of their existence as functioning labor unions. Indeed, with respect to the six affected Locals who have already complied with the GEB order to implement the Plan, those results have already occurred. The practical effect of the consolidation differs little from that of imposition of a trusteeship on the Locals, as the officers and executive boards of the

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

924 F.Supp. 528, Mason Tenders Local Union 59 v. Laborers' Intern. Union of North America, AFL-CIO, (S.D.N.Y. 1996)    **Page 14**

newly chartered locals have been appointed by the Trustee, and those officers will remain in place until Local elections to occur in May and June 1997. Credible expert testimony to this effect was adduced by the Locals.

Two sets of former Locals, 59 and 48 on the one hand, and 23 and 104 on the other, shared geographical jurisdictions. Locals 23 and 104 covered the east side of Manhattan and the west side of the Bronx. Locals 48 and 59 covered the east side of the Bronx and the west side of Manhattan from 110th Street to Battery Park. Locals 13 and 46 divided the borough of Queens. Locals 37 and 47 divided the borough of Brooklyn. Local 51 is limited exclusively to the borough of Staten Island. Local 33 covered Riverdale and the west side of Manhattan above 110th Street. There have been approximately a half-dozen jurisdictional disputes per year involving Locals 23 and 104 in Manhattan. All of the Locals included all of the crafts practiced by their members.

Under the Plan, the existing Locals will be eliminated and replaced by the two new centrally administered unions, Local 78, having 300 members, and Local 79, having 4,000 members. For both members and contractors, the new structure will allow "one stop shopping." The structure will be simplified, although the administration will be more complicated.

### Financial Effect of the Plan

Broder, the accountant hired by the Trustee, testified at the injunction hearing that his projection of $2.8 million in savings under the Plan was based solely on assumptions furnished by the Trustee, and achieved almost entirely through a projected reduction in salaries and benefits. These did not take into account the significant expenses of hiring new field representatives and other employees. No firm projection of the number of field representatives or other employees anticipated to be hired was presented.

Broder's testimony before this Court and before the Hearing Panel in the absence of the number of projected new employees, failed to establish that the new structure proposed under the Reorganization Plan, will provide the financial benefit which was initially projected.

### The Members' Right to Appeal

By letter dated March 22, 1996, Local 59 notified the GEB that, in the event the GEB ratified the Hearing's proposal, it intended to appeal that ratification to the next Convention. Upon implementation of the Reorganization Plan, the ten Local Unions whose charters will be revoked will not send delegates to the September 1996 Convention, as those Locals will cease to exist as subordinate **\*542** bodies of LIUNA, and presumably will have no status or funds to file any appeal to the Convention. The two newly chartered locals, however, which will be comprised of the members in good standing of the previously existing Locals, will be permitted to elect delegates and send them to the September Convention, pursuant to a waiver granted by the Elections Officer. Further, as noted above, any member in good standing can file an appeal to the Convention.

### Benefit to the Members

The membership of the Locals has presumably benefitted from the specialized knowledge of experienced business managers, in terms of assignments to jobs appropriate to particular members. This benefit will be lost until such time as the new officers become more familiar with the membership, its capacities, and the available work assignments. The specter of unsafe work assignments has been raised but not established, as indeed it could not be on the current record, at this early stage of the Plan's development. On the other hand, the new leadership and the elimination of any outside influence will presumably increase the integrity of the assignment and bargaining processes.

The past corruption of the District Council, extending into the Locals, was established in the Civil RICO Action and constituted the basis of the Consent Decree. The record here, principally through the testimony of the Investigations Officer, delineated certain of the past practices and assumed the likely continuation of the influence of criminal elements in the absence of restructuring. No new or additional evidence was adduced to support this assumption.

The District Council and the new Locals will share office space in Manhattan, but satellite offices are

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

under consideration. There is no demonstrated detriment of the relocation of the offices of the Locals, and some increased efficiency is likely to result from that relocation. Transfers between Locals will remain as least as freely available as under the prior structure. The clarification of union responsibilities can reasonably be predicted to benefit the members' efforts to obtain employment.

As is true of any change, the net benefit of a planned reorganization is not subject to a precise factual finding. Overall, however, the record has established that the members can expect to receive a net benefit from the Reorganization, however unpopular that Reorganization may be among the rank-and-file at this writing.

## CONCLUSIONS

### I. Preliminary Injunction Standard

[1] The standard for granting a preliminary injunction in this circuit is (1) a showing of irreparable injury and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tipping in favor of the movant. *Blum v. Schlegel,* 18 F.3d 1005, 1010 (2d Cir.1994); *Sonesta Int'l Hotels Corp. v. Wellington Assocs.,* 483 F.2d 247 (2d Cir.1973).

[2][3] The showing of irreparable harm is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction." *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 275 (2d Cir.1985) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.,* 719 F.2d 42, 45 (2d Cir.1983)). The law in this Circuit requires a showing that irreparable damages are likely, not merely possible. *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979).

### II. Irreparable Harm

Both the Locals and LIUNA have established irreparable harm.

[4] The Second Circuit has dealt with the denial of injunctive relief where that denial was based partly on a finding that the revocation of a local union charter did not give rise to irreparable injury in *San*

*Filippo v. United Bhd. of Carpenters & Joiners,* 525 F.2d 508, 512 (1975). (FN4) However, the *San* *543 Filippo* To view preceding link please click here holding, which affirmed the denial, was based in part on the Court's finding that the International would hear the appeal of the dissolved local union and that the funds of the local would remain intact. In the instant case, given the inability of the Locals whose charters have been revoked to elect and send delegates to the September 1996 Convention, the Locals' institutional ability to appeal is, at best, uncertain.

The revocation of the Locals' respective charters would terminate their existence as functioning labor unions. The implementation of the Reorganization Plan will disperse the Locals' membership, remove their elected officials from office, and confiscate their assets. The affected Locals will no longer be represented by the union members whom they democratically elected. *See Regan v. Williams,* 122 L.R.R.M. (BNA) 2441, 2443, 1986 WL 8413 (W.D.Pa.1986) (irreparable harm would occur if union members were denied right of self-determination and right to be represented by elected leaders); *Smith v. Distillery Workers,* 75 L.R.R.M. 2049, 2052, 1970 WL 638 (E.D.Ky.1970) (local union's right of self-determination is a substantial right, the deprivation of which results in irreparable injury and which cannot be meaningfully recompensed).

These circumstances constitute irreparable harm even if it is assumed that the Local's assets could be restored and their officers reinstated upon a successful appeal of the adoption of the Reorganization Plan.

[5] LIUNA has likewise demonstrated that it will suffer irreparable injury if its application for injunctive relief is denied and the Locals are not ordered to abide by the GEB's Order to implement the Reorganization Plan.

To permit the Locals to disregard the GEB's directives causes LIUNA the "substantial" hardship of depriving it of its right to self-governance in enforcing its constitution, to which the Locals are bound as subordinate bodies of LIUNA. *International Bhd. of Teamsters v. Local 810,* 19 F.3d 786, 793 (2d Cir.1994); *Yager v. Carey,* 143 L.R.R.M. (BNA) 2924, 2933, 1993 WL 328128

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

924 F.Supp. 528, Mason Tenders Local Union 59 v. Laborers' Intern. Union of North America, **Page 16**
AFL-CIO, (S.D.N.Y. 1996)

(D.D.C.1993).

Additionally, permitting the Locals to disregard the GEB's adoption of the Reorganization Plan would deprive the union and its members of the benefits of the Plan, and of the assets of the resisting Locals, which, under the Plan, are to be seized by LIUNA immediately. It is indeed the obverse of the irreparable suffered by the Locals.

### Likelihood of Success on the Merits

#### A. Standard of Review of Union Decisions

There is a well-established policy of avoiding judicial interference in union self-governance and internal affairs. *Local 810,* 19 F.3d at 788, 790; *Motion Picture Editors Guild, Local 776 v. International Sound Technicians, Local 695,* 800 F.2d 973, 975, *amended,* 806 F.2d 1410 (9th Cir.1986), *cert. denied,* 483 U.S. 1022, 107 S.Ct. 3267, 97 L.Ed.2d 765 (1987). As stated by the Second Circuit:

> Courts have no special expertise in the operation of unions which would justify a broad power to interfere. The internal operations of unions are to be left to the officials chosen by the members to manage those operations except in the very limited instances expressly provided by the [LMRDA].... General supervision of unions by the courts would not contribute to the betterment of the unions or their members or to the cause of labor-management relations.

*Gurton v. Arons,* 339 F.2d 371, 375 (2d Cir.1964) (quoted in *Felton v. Ullman,* 629 F.Supp. 251, 254-55 (S.D.N.Y.1986)); *see also Local 810,* 19 F.3d at 793 (federal courts should not "busy themselves with the internal affairs of unions, a task for which they are ill-equipped").

[6][7] Consistent with this policy, a union's interpretation of its own constitution is entitled to "great deference" and will be upheld unless "patently unreasonable." *Association of Contracting Plumbers, Inc. v. Local Union No. 2,* 676 F.Supp. 523, 530 (S.D.N.Y.1988), *aff'd,* 841 F.2d 461 (2d Cir.1988); *Ackley v. Western Conference of Teamsters,* 958 F.2d 1463, 1477 (9th Cir.1992); *Local No. 48 v. United Bhd. of Carpenters,* 920 F.2d 1047, 1052 (1st Cir.1990). As discussed more

fully **\*544** below, a court may also override an interpretation that was made in bad faith. *See Schonfeld v. Raftery,* 359 F.Supp. 380, 388 (S.D.N.Y.1973), *aff'd sub nom. Fritsch v. District Council No. 9, Brotherhood of Painters,* 493 F.2d 1061 (2d Cir.1974); *I.L.A., Local Union 1516 v. I.L.A.,* 815 F.2d 637, 639 (11th Cir.1987); *Rogers v. Lucassen,* 777 F.Supp. 997, 999 (D.D.C.1991).

Courts have routinely followed the rule of deference to union interpretations of their constitutions, and upheld international unions' reorganization and restructuring of their subordinate bodies. *See United Bhd. of Carpenters, Dresden Local No. 267 v. Ohio Carpenters Health and Welfare Fund,* 926 F.2d 550 (6th Cir.1991); *Millwright Local No. 1079 v. United Bhd. of Carpenters,* 878 F.2d 960 (6th Cir.), *cert. denied,* 493 U.S. 965, 110 S.Ct. 407, 107 L.Ed.2d 373 (1989); *Local 48,* 920 F.2d 1047. (FN5) In these cases, courts have noted that subordinate union bodies are bound by their union constitutions and, therefore, must accede to any restructuring as long as the international union's actions are based on a "plausible" or not "patently unreasonable" interpretation of its constitution, and as long as the union's actions are not shown to have been taken in bad faith. *See, e.g., Local 48,* 920 F.2d at 1052; *Local 334,* 669 F.2d at 132; *Musicians' Protective Local 274,* 329 F.Supp. at 1236 (acceptance of charter subjects local to obligation to comply with merger order); *cf. Local 810,* 19 F.3d at 793.

#### B. The GEB's Interpretation of LIUNA's Constitution is Plausible, and Not Patently Unreasonable

Here, the GEB's decision to adopt the Reorganization Plan is explicitly authorized by the LIUNA Constitution. IUC Art. VIII, §§ 2(f), 2(g). The affected Locals, including Locals 23, 46, 48, and 59, are subordinate bodies chartered by LIUNA, and are therefore bound to abide by the GEB's decision. *See* IUC Art. VIII, §§ 2(f), 2(g); ULUC Art. I, § 1, Art. II, § 3(d).

The Locals contend that three provisions of the IUC limit LIUNA's power to consolidate local unions. First, under the IUC, consolidation must be preceded by a hearing at which an adequate record supporting consolidation is made. Art. VIII, § 2(g). Second, consolidation must serve the "welfare and

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

924 F.Supp. 528, Mason Tenders Local Union 59 v. Laborers' Intern. Union of North America, AFL-CIO, (S.D.N.Y. 1996)    **Page 17**

interest" of the membership of the affected Locals. Art. VIII, § 2(f). Third, the Locals argue, after the General Executive Board ratifies consolidation, but before it is implemented, the affected Locals must be given an opportunity to appeal the ratification decision to the Convention. Art. VIII, § 2(a)(viii). The Locals contend that implementation of the Reorganization Plan would violate the IUC because (i) the Trustee's proposal was not supported by an adequate factual record; (ii) implementation of the Merger Plan prior to the Convention would effectively deprive Local 59 of its constitutional right to appeal; and (iii) consolidation would not serve the best interests of the membership of the affected Locals.

[8] LIUNA's interpretation of its Constitution, and its requirement that the acts of the GEB must serve the "welfare and interest" of the members, cannot be said to be so "patently unreasonable" as to warrant Court intervention. Indeed, even if this Court had found the evidence presented in opposition to the Reorganization more persuasive than the evidence in its favor, LIUNA's interpretation *545 of its Constitution might well be controlling, absent the requisite showing that such interpretation was "patently unreasonable." On the other hand, it could be said that any plan which does not benefit the members is, by definition, patently unreasonable.

Because the GEB's determination, and the finding set forth above, that the Plan does serve the members' best interest is "plausible" and not "patently unreasonable," under the law, LIUNA's interpretation of "best interests" trumps the Locals' interpretation of the phrase. *See Local 267 v. United Bhd. of Carpenters,* 992 F.2d 1418, 1423 (6th Cir.1993) ("It is the union's interpretation of the constitution that the courts must evaluate, and not the [subordinates'] interpretation").

[9] Similarly, the question of whether the Locals' right to appeal will be violated by the Plan's immediate implementation is a matter of constitutional interpretation. Pursuant to the waiver granted by the Elections Committee, the members of the two newly-chartered unions—which will be comprised largely of former members of the unions whose charters will be revoked pursuant to the Plan—will elect and send delegates to the Convention. Moreover, IUC Article VIII, Section

2(a)(viii) guarantees not only "subordinate bod[ies]," but also "[a]ny member" the right to appeal a GEB directive to the Convention. Although the affected Locals will have no institutional representation at the September 1996 Convention, there can be nonetheless an appeal at the Convention to challenge the adoption of the Plan.

[10] Finally, as to due process with respect to the Hearing, courts have consistently held that a union need only follow the procedures set forth in its constitution when contemplating a reorganization that may involve charter revocations. *See Local 267,* 992 F.2d at 1425; *United Bhd. of Carpenters, Local Union No. 853 v. United Bhd. of Carpenters,* 83 L.R.R.M. (BNA) 2759, 2765-66, 1973 WL 1199 (D.N.J.1972), *aff'd,* 84 L.R.R.M. (BNA) 2128, 480 F.2d 919 (3d Cir.1973); *Local No. 1 v. International Bhd. of Teamsters,* 419 F.Supp. 263, 288 (E.D.Pa.1976) ("There is no independent requirement of law that a referendum, 'due process', or a 'fair hearing' be afforded prior to a merger of locals").

In the instant case, the only constitutional requirement is notice and a hearing. *See* IUC Art. VIII, § 2(g). Although the Locals contest the adequacy of the notice they received, they do not dispute that they were provided notice of the upcoming hearing at least 14 days prior to its commencement. Although the Locals did not receive the details of the Plan until the day the hearing commenced, the 14-day notice of the hearing was sufficient to satisfy the IUC requirement. Further, as required by the IUC, the GEB held a hearing on the Proposal. The hearing transcript demonstrates that the hearing was conducted in a manner that provided all parties at least some opportunity to be heard.

[11] Internal union hearings are not held to the standards applicable to judicial proceedings and are not required to provide the full panoply of procedural protections associated with judicial proceedings such as "the right to be represented by counsel and the technical rules of pleading, procedure and evidence." *Frye v. United Steelworkers,* 767 F.2d 1216, 1225 (7th Cir.1985); *see also United States v. IBT,* 998 F.2d 120 (2d Cir.1993). The Locals' arguments regarding the inability to cross-examine witnesses, the late service of documents, and the exclusion of counsel from the

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

Hearing are therefore not persuasive. *See, e.g., Tam v. Rutledge,* 475 F.Supp. 559, 569 (D.Haw.1979); *International Bhd. of Elec. Workers Local 1186 v. Eli,* 307 F.Supp. 495, 510 (D.Haw.1969).

While the proof submitted during the hearing of the instant motions was not overwhelming with respect to certain of the alleged practices found by the Hearing Panel, that proof was satisfactory for the instant purposes. The evidentiary standards applicable in these circumstances allow hearsay and inferences which might well not be permitted in another action before the Court. Here, there was evidence, some of it conclusory in form, which did support the findings of the Panel. For example, although there was no direct evidence of particular special agreements between contractors and the Locals to permit the use of non-union labor, **\*546** there was evidence that non-union labor was hired, and that practice was the subject of testimony by the Investigations Officer.

In sum, in the instant circumstances, where the GEB's interpretation of LIUNA's governing documents does not contradict a specific constitutional limitation and is supported by evidence, and is not "patently unreasonable," that interpretation must be upheld. *See Millwright Local 1079,* 878 F.2d at 962-65 (rejecting challenge to merger based on argument that merger infringed on members' voting rights guaranteed by other constitutional provisions, where international union's interpretation was not unfair or unreasonable); *Local 1,* 143 L.R.R.M. at 2110 (rejecting challenge to consolidation of seven locals because, *inter alia,* union constitution did not provide locals with veto power over consolidations); *Musicians' Protective Local 274,* 329 F.Supp. at 1236 ("There is nothing in the Constitution or By-Laws which prohibits an order of merger.").

To the extent the public interest is relevant, it has been noted that the Government also has concluded that the Plan is reasonable and appropriate.

*The Locals Have Not Established LIUNA's Bad Faith*

[12] In the absence of a showing that LIUNA's interpretation of its Constitution was patently unreasonable, the Locals must demonstrate that the

Plan was undertaken in bad faith. *See Local 48,* 920 F.2d at 1053 ("a union's action, though arguably authorized by, and not patently unreasonable under, its governing documents, may still be blocked by the courts if undertaken in bad faith"). The *Local 48* standard, that "bad faith in ordering a merger can be found on evidence that union officials acted contrary to the International's best interests, out of self-interest, or in an unconscionable or outrageous way," *Local 48,* 920 F.2d at 1055, was adopted by the Second Circuit in *Local 810. Local 810,* 19 F.3d at 794. The Locals contend that the Reorganization Plan here was proposed and ratified in bad faith, because (i) the implementation of the Plan is not in the best interests of the rank-and-file and will result in reduction of job opportunities and access to elected representatives; (ii) the adoption of the Plan was procedurally deficient; and (iii) the Plan is a pretext intended to achieve the results of extending the trusteeship and disciplining Local union officers without following the relevant requirements under the IUC and the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 464.

As to the best interests of the membership, LIUNA submitted evidence that benefits would flow to the rank-and-file members as a result of the consolidation. Those benefits would principally consist of the elimination of past practices which were found by the government to increase the influence of criminal elements over the affairs of the Locals. Although the Locals have expressed their view that the Plan is not in the members' best interests, that view of the Plan's impact is contradicted by certain of the factual findings set forth above.

Moreover, even if this Court agreed with the Locals' view that the Plan was not in the best interests of the rank-and-file members, such a view would not necessarily support a finding of bad faith as defined in *Local 48.* The standard set forth by the First Circuit in *Local 48* and adopted by the Second Circuit in *Local 810* defines bad faith as actions contrary to the best interests of the international, not the rank-and-file.

Further, as set forth above, the process by which the Reorganization Proposal was adopted was appropriate. It has not been established, as the Locals allege, that the Hearings Panel and the GEB

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

924 F.Supp. 528, Mason Tenders Local Union 59 v. Laborers' Intern. Union of North America, AFL-CIO, (S.D.N.Y. 1996)                                                    **Page 19**

decided in advance of the Hearing to approve the Plan regardless of the harm it would cause the Locals and their members. The Locals' contentions regarding the lack of due process do not, in and of themselves, demonstrate that LIUNA acted "contrary to [its] best interests, out of self-interest, or in an unconscionable or outrageous way," as required to demonstrate bad faith. *See Local 810,* 19 F.3d at 794 (quoting *Local 48, 920* F.2d at 1055).

The Locals' central substantive allegation of bad faith is that the Plan was proposed and ratified to remove elected officials of the affected Locals without adhering to the requirements *547 imposed by the LMRDA in the context of disciplinary and trusteeship proceedings. The Locals correctly point out that the Plan's implementation would very closely approximate the effect of disciplinary proceedings, or the extension of a trusteeship to the Locals. (FN6) In support of this pretext theory, the Locals point to the September 7 Memo.

With respect to the "best interests" and "unconscionable or outrageous" tests, this Court may not infer "bad faith" based upon the decision of the GEB to adopt the Reorganization Plan rather than employing other means, such as trusteeship or disciplinary proceedings, to reach the same goal. Such opinions "go to the very heart of what the internal union hearing [was] designed to accomplish, and are essentially unrelated to whether [LIUNA] acted in bad faith" when it adopted the Reorganization Plan. *Local 810,* 19 F.3d at 794 (international union entitled to injunction enforcing trusteeship where local union's references to bad faith focussed on whether or not trusteeship was warranted). *See Local 1052 v. Los Angeles County District Council of Carpenters,* 944 F.2d 610, 615 (9th Cir.1991) (rejecting the argument that a union merger was effected in bad faith based on allegations concerning the merger's implementation, the lack of an investigation, and the lack of specific findings). Courts have consistently held that the procedural requirements of the LMRDA with respect to trusteeships are inapplicable to the situation of a charter revocation or other union restructuring. *See Local 1,* 143 L.R.R.M. at 2112; *Local No. 267,* 992 F.2d at 1425; *Local 48,* 920 F.2d at 1057; *Millinery Workers' Union Local 55/ 56,* 495 F.Supp. at 63; *Brewery Bottlers Union Local 1345 v. International Bhd. of Teamsters,* 202

F.Supp. 464, 467-68 (E.D.N.Y.1962).

In addition, our Circuit has held that a merger or revocation decision may only constitute a trusteeship if there is continuing supervision over the subordinate body by the international union following the restructuring. *San Filippo v. United Bhd. of Carpenters,* 525 F.2d 508, 513 (2d Cir.1975). (FN7) Here, the Reorganization Plan completely dissolves the Locals and there will be no ongoing supervision of the two new local unions by LIUNA, the District Council, or Hammond, other than in the normal course of affairs under the LIUNA Constitution. The members in good standing of the dissolved Locals retain all membership rights and will continue to govern themselves in the two newly constituted autonomous local unions. The officers provisionally appointed by Hammond to comprise the Executive Boards of the two new locals have been sworn in and will act with the same rights and duties under the LIUNA Constitution as the officers of any other LIUNA affiliate, including the former Locals.

Here, LIUNA, through the Trustee, has appointed provisional officers of the two new locals for terms barely more than one year, with rank-and-file elections set for May-June 1997. The LMRDA and its accompanying regulations permit these appointments. *Local 1,* 143 L.R.R.M. at 2111 ( *citing* 29 C.F.R. § 452.14) (two-year appointment of provisional officers in newly-constituted locals). *See also Kahn v. Hotel & Rest. Emp.,* 469 F.Supp. 14, 21-22 (N.D.Cal.1977), *aff'd,* 597 F.2d 1317 (9th Cir.1979). This one-year appointment is well below the term set in the ULUC, *see* ULUC Art. VI, § 1(h), which provides for provisional appointments of officers for any unexpired period of the statutory three-year term of office. *Id.* at Art. VI, § 3(m).

Almost every union determination, particularly those involving restructuring, is likely to be opposed by some groups and officials. The Second Circuit, the First Circuit, and the Ninth Circuit have instructed *548. that the inquiry into bad faith should be employed where there is evidence that a union official had a "sinister motive" or intent to benefit personally, such as some pecuniary gain. *See, e.g., Local 810,* 19 F.3d at 794; *Local 48,* 920 F.2d at 1054-55 (rejecting plaintiffs' claim that a defendant union official benefitted personally from

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

924 F.Supp. 528, Mason Tenders Local Union 59 v. Laborers' Intern. Union of North America, AFL-CIO, (S.D.N.Y. 1996)    **Page 20**

an alleged "deal" between international union and merger beneficiary); *Local 1,* 143 L.R.R.M. at 2113 (dismissing "bad faith" challenge to merger of locals in absence of evidence that any Executive Board member personally benefitted from merger). (FN8)

The Locals have not established that any GEB member acted upon a sinister motive to achieve a pecuniary gain or other type of impermissible personal benefit from the Reorganization Plan. Nor is there any evidence that, as a result of the Plan's implementation, any GEB member received or will receive the type of personal benefit required for a finding of bad faith, such as a monetary inducement or exchange. *See Local 48,* 920 F.2d at 1055 (personal financial gain is the type of self-interest establishing that a union official acted in "bad faith"). No authority has been adduced for the proposition that complying with the public interest and acting to eliminate the possibility of corruption constitutes bad faith.

In sum, "[a]t the heart of this dispute lies a simple conflict between the best interests of [the] Local Union ... and the best interests of the International. The Court cannot resolve that conflict. The Court can only decide whether or not the International acted in conformity with [its] Constitution and with federal law. The Court finds that it did." *Local 1,* 143 L.R.R.M. at 2113.

### Conclusion

While both LIUNA and the Locals have made the requisite showing of irreparable injury, only LIUNA has demonstrated a probability of success on the merits. Therefore, LIUNA's application for injunctive relief will be granted, and the Locals' will be denied.

The relief granted by this opinion will be stayed for ten (10) days from the date hereof to permit an application for further proceedings before the Court of Appeals. The prior temporary restraint will be continued for that purpose.

It is so ordered.
(FN1.) As discussed below, the two exceptions, Locals 33 and 60, negotiate their own collective bargaining agreements and maintain their own trust funds. These two Locals are not subject to the

Reorganization Plan.

(FN2.) Local Unions 30 and 66 were excluded from the Reorganization Proposal because, as the Trustee explained in his testimony at the Hearing, these Locals share characteristics which mandate that they remain separate from the two newly-chartered local unions: (1) they are the only District Council Locals to negotiate and enforce their own collective bargaining agreements, and to have their own benefit trust funds; and (2) they have established exclusive jurisdictions--Local Union 30 is the only New York City Local Union that represents plasterer tenders, and Local Union 66 is a geographically distinctive Local Union that has exclusive jurisdiction over all LIUNA building laborers in Long Island. Tr. II, pp. 8-10.

(FN3.) Chertoff also submitted a 42 page Report with exhibits in response to the Reorganization Proposal. This Report and exhibits were submitted the Hearings Panel and contains the underlying facts and evidence supporting Chertoff's testimony.

(FN4.) *See also Central Conference of Teamsters v. International Bhd. of Teamsters,* No. 93 Civ. 2247 (S.D.N.Y. June 10, 1994) (local bodies denied preliminary injunctive relief seeking to enjoin international union from revoking charters because Court could reinstate charters and award damages to compensate for interference with their business operations).

(FN5.) *See also Local 334 v. United Ass'n of Journeymen,* 669 F.2d 129 (3d Cir.1982); *Local 37 v. Sheet Metal Workers' Int'l Ass'n,* 655 F.2d 892 (8th Cir.1981); *Parks v. International Bhd. of Elec. Workers,* 314 F.2d 886 (4th Cir.), *cert. denied,* 372 U.S. 976, 83 S.Ct. 1111, 10 L.Ed.2d 142 (1963); *Teamsters Joint Council No. 42 v. International Bhd. of Teamsters,* 896 F.Supp. 987 (C.D.Cal.1995), *appeal pending; Local Union 1 v. International Union of Bricklayers,* 143 L.R.R.M. (BNA) 2107, 1992 WL 118798 (D.Minn.1992); *Bernstein v. Nolan,* 135 L.R.R.M. (BNA) 2591 S.D.N.Y.1990); *Local 90 v. United Ass'n of Journeymen,* 692 F.Supp. 434 (M.D.Pa.1988); *Local 311 v. United Ass'n of Journeymen,* 130 L.R.R.M. (BNA) 2063, 1988 WL 74053 (D.Conn.1988); *Local 796 v. Powell,* 124 L.R.R.M. (BNA) 2053, 1986 WL 15481

924 F.Supp. 528, Mason Tenders Local Union 59 v. Laborers' Intern. Union of North America,    **Page 21**
AFL-CIO, (S.D.N.Y. 1996)

(N.D.Cal.1986); *Millinery Workers' Union Local 55/56 v. United Hatters Int'l Union,* 495 F.Supp. 60 (E.D.Mo.1980); *Strong v. Sheet Metal Workers' Int'l Ass'n,* 90 L.R.R.M. (BNA) 2795, 1974 WL 1171 (N.D.Cal.1974); *cf. Musicians' Protective Union Local No. 274 v. American Fed'n of Musicians,* 329 F.Supp. 1226 (E.D.Pa.1971) (enforcing expulsion of local union that refused to comply with direction issued by international union to merge with another local union).

*548   (FN6.) Insofar as the Locals argue that the Plan was ratified in order to avoid having to formally extend the trusteeship, the recent extension of Hammond's trusteeship beyond the original 18-month period undermines the Locals' position.

(FN7.) The Court in *San Filippo* did not find that a trusteeship existed or issue an injunction restraining the international union from implementing the merger, notwithstanding that the court found an issue of fact whether the international's appointment of a representative to provide "guidance" to the new local might constitute a trusteeship.

(FN8.) In *Local 1,* the district court rejected several of the contentions raised by the Locals here in upholding a consolidation of seven local unions. For example, the district court rejected the assertions that the consolidation violated the international constitution, members' right to vote, and the merged locals' right to sue, that the consolidation constituted discipline and/or a trusteeship under the LMRDA, and that the consolidation was effected in bad faith.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works