In the Matter of Local Union 79
New York, NY

Laborers' International Union of North America
Independent Hearing Officer

Docket No. 04-19T

Decided: September 24, 2004

**ORDER AND MEMORANDUM**

## PROCEDURAL HISTORY

This Order and Memorandum addresses the Voluntary Supervision entered into between Laborers' International Union of North America (LIUNA) General President Terence M. O'Sullivan (General President), LIUNA General Executive Board (GEB) Attorney Robert Luskin, and the Construction and Building Laborers' Local 79 (Local 79), by and through its Executive Board, on July 20, 2004. *See* GEB Ex. 37 (Voluntary Supervision Agreement of 7/20/04). By agreement of the parties, the Supervision began on September 1, 2004. *Id.*

On August 20, 2004, LIUNA properly informed Local 79 members and officers of the imposition of the Voluntary Supervision. *See* Letter from Robert D. Luskin to the Officers and Members of LIUNA Local 79 of 8/20/04 (IHO Dkt. tab 1); *see also* LIUNA Ethics and Disciplinary Procedure (EDP), Section 3 (delegating General President's authority to impose supervision on the GEB Attorney). The GEB Attorney informed Local 79 that the need for supervision resulted from an investigation of Local 79, which revealed that the Local (1) made deals with Union vendors that violated the Ethical Practices Code (EPC); (2) expended Union assets on items that did not benefit the Local; (3) expended Union funds without the required approval from the LIUNA Inspector General; (4) expended Union funds without the apparent approval of the membership; and (5) obstructed the Inspector General's investigation. *Id.* The GEB Attorney further noted that several officers had resigned because of the investigation, leaving a void in the leadership of Local 79. *Id.* Vice President and Eastern Regional Manager Raymond Pocino was appointed Supervisor of Local 79. *See* Letter from Robert D. Luskin to Mr. Raymond Pocino of 8/20/04 (IHO Dkt. tab 2).

The GEB Attorney informed the members and officers of Local 79 that, pursuant to Article IX, Section 7 of the LIUNA Uniform International Union Constitution (International Constitution) and Section 3 of the EDP, the LIUNA Independent Hearing Officer (IHO) would hold a hearing to review the grounds upon which Local 79 was placed in voluntary supervision. *See* Letter from Robert D. Luskin to the Officers and Members of LIUNA Local 79 of 8/20/04

1

Luskin Declaration
Attachment E

(IHO Dkt. tab 1). The hearing was held on September 7, 2004, at 10 a.m. at St. Vartan Cathedral, 630 Second Avenue, New York, New York. *Id.* GEB Attorney Patrick Slevin appeared on behalf of the International Union with LIUNA Inspectors John Billi[1] and Thomas Limberg.[2] The hearing was widely attended by the rank and file membership of Local 79, as well as the remaining Local 79 officers and Executive Board members.

## SUPERVISION REQUIREMENTS

Supervisions are "among the most effective devices which responsible international officers have to ensure order within their organization." *Executive B. Local 302, United Bhd. Of Carpenters and Joiners of Am. v. United Bhd. Of Carpenters and Joiners of Am.*, 477 F.2d 612, 614 (2d Cir 1973), *citing* 1959 Cong. & Adm. News 2333. Supervisions have been "widely used to prevent corruption, mismanagement of union funds, violation of collective bargaining agreements, . . .; in short, to preserve the integrity and stability of the organization itself." *Id.* The Labor Management Reporting and Disclosure Act (LMRDA) gives a governing body, in this case LIUNA, discretion in placing its member organizations under supervision to correct certain problems. *See* 29 U.S.C. §§ 461-466. Under § 302 of the LMRDA, there are two conditions for the valid imposition of a supervision: the union must comply with its own constitution in establishing and administering the supervision, and the supervision must be imposed for an enumerated purpose. *Id.* § 462.

A parent labor union may impose, "in accordance with its constitution and bylaws," a supervision over an affiliated local union "for the purpose of correcting financial malpractice, assuring the performance of collective bargaining agreements or other duties of the bargaining representative, restoring democratic procedures, or otherwise carry out the legitimate objects of the parent union." 29 U.S.C. § 462. Under the LIUNA International Constitution, the General President may appoint a supervisor when:

> action is necessary for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures or otherwise

---

[1]  Billi is an accountant and former agent for the Federal Bureau of Investigations.

[2]  Lindberg is a former officer for the New York City Police Department.

> carrying out the legitimate objects of such subordinate body of
> the International Union, or to protect the organization as an
> institution. . . .

International Constitution, Article IX, Section 7. Section 3 of the EDP grants
the GEB Attorney the authority to impose a supervision over any entity within
the Union. EDP, Section 3. The appointed Supervisor has the power to remove
any officer or member of the Executive Board at any time. *See* International
Constitution, Article IX, Section 7.

## FINDINGS OF FACT

1. Local 79 is located in New York, New York, and has 8,445 members,
1,658 of whom are retirees.

2. Local 79 was formed on April 4, 1996, when several local unions
affiliated with the Mason Tenders' District Council of Greater New York and
Long Island (Mason Tenders' District Council) merged under a GEB Attorney
reorganization plan. *See* Letter from Arthur A. Coia to Raymond Pocino of
4/4/96 (IHO Dkt. tab 4). The merger was brought about as the result of a
Consent Decree between the United States Department of Labor and the Mason
Tenders' District Council.

3. The Consent Decree placed the Mason Tenders' District Council under
court-authorized trusteeship because it was an enterprise whose affairs were
conducted through a pattern of racketeering activity in violation of 18 U.S.C. §
1962. *See United States, et al. v. Mason Tenders District Council of New York,
et al.*, Consent Decree (S.D.N.Y. December 1994) (No. 94 Civ. 6487).

4. After the formation of Local 79, the Mason Tenders' District Council
Trustee appointed several officers in furtherance of the reform effort. Those
individuals included, *inter alia*: Frank Noviello, President; Mike Prohaska, Vice
President; and Dan Kearney, Secretary-Treasurer.

5. Keith Loscalzo (Loscalzo) is the Business Manager of Local 79 and a
member of the Executive Board, both positions he held at all times relevant to
this matter. Tr. 41, 91.

6. At the time relevant to these charges, Frank Noviello (Noviello) was
the President of Local 79 and a member of the Executive Board. *See* GEB Ex.
32 (*In the Re Frank Noviello, Local 79*, Settlement Agreement of 6/8/04). In
May 2004, Noviello resigned his positions with Local 79; in June 2004, he
entered into a settlement agreement with the GEB Attorney, which prevents him
from ever holding office in or being employed by any LIUNA entity. *Id.*
Noviello retained his Local 79 membership. *Id.*

7.  Kenneth Brancaccio is the current President of Local 79.  *See* GEB Ex. 35 (Local 79 Executive Board Meeting Minutes of 7/7/04).

8.  John Norbury (Norbury) is the Vice President of Local 79 and a member of the Executive Board, both positions he held at all times relevant to this matter.  *Id.*

9.  At the time relevant to these charges, Daniel Kearney (Kearney) was the Secretary-Treasurer of Local 79 and a member of the Executive Board, as well as the Secretary-Treasurer of the Mason Tenders' District Council. Kearney resigned from his positions on March 11, 2003.  Tr. 10:20-21.  As described, *infra* ¶ 22, Kearney pled guilty to federal charges and awaits sentencing.

10.  Victor Rizzo is the current Secretary-Treasurer of Local 79.  *See* GEB Ex. 35 (Local 79 Executive Board Meeting Minutes of 7/7/04).

11.  Mike Prohaska is the Recording Secretary of Local 79 and a member of the Executive Board, both positions he held at all times relevant to this matter. *Id.*

12.  At the time relevant to these charges, Andrew Cefalo (Cefalo) served an elected member of Local 79's Executive Board, was employed as a Special Assistant to the Executive Board, and was an elected Delegate to the Mason Tenders' District Council.  Tr. 57 – 58; *see also* GEB Ex. 33 (*In Re Andrew Cefalo, Local 79,* Settlement Agreement of 6/8/04); GEB Ex. 35 (Local 79 Executive Board Meeting Minutes of 7/7/04).  On June 7, 2004, Cefalo resigned from all of his positions and entered into a settlement agreement with the GEB Attorney, which prevents him from ever holding office in or being employed by any LIUNA entity.  *Id.*  Cefalo retained his Local 79 membership.  *Id.*

13.  At the time relevant to these charges, Anthony Silveri (Silveri) was a member of Local 79 and the Business Manager of the Mason Tenders' District Council.  *See* GEB Ex. 34 (*In the Matter of Anthony Silveri, Local 79,* Settlement Agreement of 8/12/04).  In August 2004, Silveri entered into a settlement agreement with the GEB Attorney, which prevents him from ever holding office in or being employed by any LIUNA entity.  *Id.*  Silveri retained his Local 79 membership.  *Id.*  Silveri will resign his position as Business Manager of the Mason Tenders' District Council effective October 1, 2004.  Tr. 80.

14. Thus, as a result of the Inspector General's investigation, three officers and one member of Local 79 have resigned their posts and made settlement agreements in which they are barred from holding LIUNA office.[3]

<u>Background of Inspector General's Investigation of Local 79</u>

15. In 2002, Local 79, the Mason Tenders' District Council, and a number of other affiliated entities moved to new offices and, as part of that move, there was a large outlay of Union funds for locating a new space, construction, and the purchase of, *inter alia*, new furniture. Tr. 9:9-18.

16. In January 2003, the accountants hired by Local 79 conducted the year-end review of the Local's finances, taking a specific view of how the moving expenditures were documented in addition to the normal and customary expenditures of the Local. Tr. 9:2-24.

17. Local 79's accountants determined, as a result of their audit, that Secretary-Treasurer Kearney had embezzled funds from the Local, which they immediately reported to the members of the Executive Board and the Inspector General's office. Tr. 10:13-25.

18. When confronted with the evidence of his embezzlement, Kearney resigned on March 11, 2003. *Id.*

19. Shortly thereafter, Inspector General Investigators, Mr. Billi and Mr. Limberg, began a detailed investigation of the Local in March 2004. Tr. 10:22 – 11:3. The focus of the investigation was threefold: to determine the extent of Kearney's embezzlement, to determine whether anyone else was involved in his embezzlement of Union funds, and to determine whether Kearney's embezzlement was an isolated circumstance or indicative of larger problems in the Local. Tr. 11:14 – 12:4.

20. The investigators interviewed approximately 75 officers and employees of Local 79, as well as Union vendors to Local 79. Tr. 12. The investigators scrutinized the Local's relationships with vendors and reviewed hundreds of pages of financial documents. *Id.*

---

[3] Of those four, Kearney's settlement agreement is still pending, but his federal felony conviction is an undisputable basis for his removal from LIUNA. *See* EPC, *Barred Conduct*, Section 5(a) ("committing any act of racketeering, which includes crimes such as bribery, extortion, fraud, [and] accepting kickbacks," clearly prohibited).

21. After approximately two months of investigating, the Inspector General's office referred evidence of Kearney's criminal conduct to federal and state law enforcement officials in New York. *Id.*

22. By January 2004, the GEB Attorney issued deposition notices for approximately ten officers, employees, or regular members of Local 79 and the Mason Tenders' District Council, which were conducted in February 2004. Tr. 16 - 17.

Kearney's Embezzlement

23. The investigation revealed that Kearney embezzled approximately $150,000 from Local 79 by, *inter alia*, purchasing gifts for himself and others with Union assets, over the course of three years. Tr. 19, 22.

24. In 2000, Kearney charged $23,636.72 in personal expenses to his Union credit card. GEB Ex. 1 (D Kearney 2000 Union Credit Card Charges). The Union credit card was used for personal purchases at, *inter alia*, Blockbuster Video, CVS Pharmacy, Coconuts, Sea Breeze Jewelers, Today's Man, and Ticketmaster. *Id.*

25. In 2001, Kearney charged $40,830.39 in personal expenses to his Union credit card. GEB Ex. 2 (D Kearney 2001 Union Credit Card Charges). Those charges included purchases from various jewelers, clothing stores, video rental stores, gift stores, and amusement parks. GEB Ex. 2 (D Kearney 2001 Union Credit Card Charges).

26. In 2003, Kearney charged $84,923.01 in personal expenses to his Union credit card. GEB Ex. 3 (D Kearney 2002 Union Credit Card Charges). Examples of those charges include Broward Limousines, Bally's Hotel & Casino, Bed, Bath & Beyond, various drug stores, For Your Entertainment, and several Las Vegas casinos. *Id.*

27. In April 2004, the United States Attorney for the Southern District of New York filed a criminal information against Kearney charging him with embezzlement from LIUNA. Tr. 27. In June 22, 2004, Kearney pled guilty to the charges and is scheduled for sentencing in October 2004. *Id.*

28. Kearney paid $149,320.21 in restitution to the Local. GEB Ex. 4 (Copies of Kearney Restitution Checks).

*P.C. Richard & Son ~ The Appliance \* Electronics \* Computer Giant*

29. P.C. Richard & Son (P.C. Richard) was a vendor of appliances and electronic equipment to the Local. Tr. 28.

30. On December 23, 2002, a $21,000 check from Local 79 was issued to P.C. Richard for the payment of "construction costs." GEB Ex. 6 (Copy of Check # 2219, $21,000 Payable to P.C. Richard).

31. The back-up documentation for this check was an undated bill from P.C. Richards for three Mr. Coffee machines, five DVD players, ten 19" television sets, 15 Aiwa stereos, two G.E. refrigerators, eight Compaq Notebooks, and two microwave ovens. *See* GEB Ex 7 (P.C. Richard Undated Invoice #1-1271589-1, signed by Salesmen Azeez Kahn). A handwritten memo on the invoice indicated "Xmas party & office space." *Id.*

32. The second page of the invoice contained the following instructions: "Upon delivery, dryer is set in place . . . range is set in place . . . dishwasher is uncrated and left in kitchen . . . new washer will be installed and leveled." *Id.* at 2. The notation led to further investigation of the purchase.

33. The P.C. Richards salesman, Azeez Kahn, admitted that the receipt was falsified as a favor to Kearney to cover the sale of home appliances to Mason Tenders' District Council Business Manager Silveri. Tr. 29 -30.

34. The actual invoice for the $21,000, numbered 1-1271589, indicates that Silveri was the purchaser of various kitchen appliances with individual service contracts for each unit. GEB Ex. 5 (P.C. Richard Statement of 2/25/03 for #1-1271589). The purchases were made on December 15, 2002; the Union issued a check on December 23, 2002, and delivery of the items to Silveri's house began the same day.

35. Kearney told Inspector General investigators that he informed Silveri that he had used Union funds for the appliance purchases about four or five days afterwards. Tr. 31. Silveri, on the other hand, maintained that he was unaware that Union funds had been used for the purchases and expected to be billed for the appliances. *Id.* Salesman Kahn stated that, even for a valued customer such as Local 79, P.C. Richards has never shipped goods prior to receiving payment in full. *Id.*

36. Delivery of Silveri's various kitchen appliances occurred on December 23, 2002, January 3rd, January 14th, January 17th , and January 19, 2003. In total, Silveri received five different appliance deliveries without, according to him, once receiving an invoice for payment. Silveri's assertion that he was unaware that Union funds were expended for these purchases is implausible.

37. In February 2002, the Kearney used his Union credit card to pay for two television sets belonging to Silveri. *See* GEB Ex. 8 (P.C. Richard Statement for Invoice #1-271607, Full Deposit Paid on 2/15/02). Silveri again explained to investigators that he was unaware of what Kearney had done and believed he would be billed for the television sets on the same invoice as the appliances ordered some two months before.

38. On March 12, 2003, Silveri paid P.C. Richard $22,208.83. Tr. 34.

Improper Vendor Relationships

39. The EPC prohibits Union officers and representatives from accepting gifts or payments of any kind from entities with which the Union does business. EPC, *Business and Financial Activities of Union Officials*, p.5.

40. "Any compensation to a union official, whether in the form of a kickback, valuable gift, lavish entertainment or anything of substantial value, made by an employer with which the Union bargains, or by a vendor or service provider with which the Union does business, is prohibited." *Id.*

41. Since Union officers are charged with determining the best use of the Union's money, receipt of gifts obviously compromises the integrity of that process. Officers impartiality may be called into question if they are receiving things of value from vendors involved in the bidding processes.

42. In this investigation, the Inspector General and GEB Attorney have been very careful to distinguish between an officer or employee receiving a gift and a general policy of a vendor in which the vendor gives the entire membership the same discount. Tr. 38. When a Union officer or employee takes a free gift or substantially discounted item, they are taking a benefit for themselves that should go to the whole membership. Tr. 39.

43. Local 79 vendors' willingness to provide the Local with false documents for many expenditures in the interest of maintaining a friendly relationship with the Union permeated vendors' interaction with Local 79. Tr. 35.

44. The examples set forth below are flagrant violations of the EPC policy prohibiting officers and representatives from accepting gifts or payments of any kind.

45. In addition to EPC policy regarding vendors, the LIUNA Accounting and Finance Manual for Secretary-Treasurers, which was distributed to all Locals in April 2001, delineates the proper process for disbursements as follows:

> It is the responsibility of union officials to obtain goods and services at a reasonable rate. For major transactions, the Local Union must utilize competitive bidding. This does not mean that the Local Union must take the cheapest bid for any work done, but that it must obtain at least three bids and do an

analysis to determine which bid best fits the needs of the Local Union. . . . .[4]

Secretary-Treasurer's Accounting and Finance Manual, Section 2.1.1.

46. Local 79 also failed to conform to these accounting guidelines in obtaining the goods and services outlined below.

### Franklin Square Ford

47. In 1998, Local 79 received four union bids for automobile leases and chose Franklin Square Ford (Franklin). Tr. 37. Thereafter, they continued to use Franklin Ford every year without ever soliciting any other bids.

48. Franklin Ford leased Local 79 automobiles for specific terms, usually two-year leases. Tr. 36:4. However, Local 79 frequently turned leased vehicles in early.

49. Cefalo, former Local 79 Special Assistant to and member of the Executive Board, bought a 2001 Ford Explorer, with 51,962 in mileage, from Franklin Ford in January 2002, after the vehicle came off lease to Local 79. *See* GEB Ex. 9 (Misc. Documents Relating to Cefalo Purchase). Although the invoice listed the value of the automobile as $17, 197.09, the actual Blue Book of the vehicle was $18,725.00. *Id.* Cefalo paid $1,200.00 for the automobile. *Id.* When Cefalo spoke to the Franklin Ford salesman, the salesman described it as a payback for all the business the dealership was getting from the Local. Tr. 40. Cefalo eventually paid the dealership the remainder of the invoice for the Ford Explorer after investigation into the matter began. Tr. 40.

50. In November 2002, Local 79 Business Manager Loscalzo's wife purchased a 2002 Ford Explorer previously leased by the Local. *See* GEB Ex. 10 (Misc. Documents Relating to Loscalzo Purchase). The invoice sales price for that vehicle was $17,000, the actual Blue Book value was $21,975.00, and Mrs. Loscalzo paid $8,000 for the automobile.[5] *Id.* After the investigation, Mr. Loscalzo paid Franklin Ford the remainder of the invoice price. Tr. 41.

---

[4] Prior to distribution of the Manual (from 1998 onward), the audit program consistently notified locals through its audits that the locals needed to obtain three bids.

[5] In March 2000, Mrs. Loscalzo had purchased another Ford Explorer from Franklin Ford that the Local had previously leased. *See* GEB Ex. 11 (Misc. Documents Relating to Loscalzo Purchase). She had also paid $8,000 for that 1998 automobile. *Id.*

51. On February 4, 2003, Franklin Ford permitted Mason Tenders' District Counsel Business Manager Silveri to obtain possession of a 2001 Ford F150 that the Training Fund had previously leased. Tr. 42. The truck was valued at approximately $19,000. *See* GEB Ex. 12 (Misc. Documents Relating to Silveri Transaction). Silveri left the dealership with the truck that day without putting any money down on the vehicle or signing any promissory note. Tr. 42 – 43. After information regarding the investigation of Kearney's embezzlement became known a few weeks later, Silveri returned to Franklin Ford and attempted to pay for the vehicle. The dealer told Silveri that the truck was paid for, although Silveri stated that he never followed up on what the dealer meant by that. Tr. 43.

52. Two weeks after Silveri took possession of the Ford F150 (which he didn't pay for), the Union received three invoices from the dealership for repair work done to Noviello's car, Ken Brancaccio's (Brancaccio) car, and a car whose VIN number the Local could not determine. Tr. 44. At the time both Noviello and Brancaccio were in Florida for a Union related event, and Brancaccio never had any work done on his automobile. *Id.* The Local office secretary, Lorraine Perry, called the dealership and questioned the bills because there were no descriptions on the invoices. *Id.* Franklin Ford never substantiated the $5,582.97 in charges and never questioned the Local's failure to pay those bills. Tr. 45; *see also* GEB Ex. 13 (Franklin Ford Invoices for 2/19/03 and 2/21/03).

53. Four months after Secretary-Treasurer Kearney returned a 2001 Ford Crown Victoria, after just eight months of a two-year lease, Franklin Ford provided Kearney with a falsified document regarding the lease termination. *See* GEB Ex. 14 (Letter from John Smisek to Daniel Kearney of 2/6/02). The Crown Victoria was replaced with a lease for a 2002 Lincoln Town Car with a MSRP approximately $20,000 higher than the Crown Victoria. *Id.* The dealer allegedly gave the Local a credit of $5067.88 for the early termination of the lease, but the Local had still not accounted for the funds a year later. *See* GEB Ex. 14 (Letter from John Smisek to Daniel Kearney of 2/5/03).

54. As described below, Local 79 also improperly paid for maintenance on employees' personal automobiles at Franklin Ford.

55. Mason Tenders' District Council secretary, Florence Muscolino, told LIUNA investigators that Kearney approved $2,574.00 for her personal automobile repairs. Tr. 55, *see also* GEB Ex. 21 (Franklin Ford Invoices #87204 – FOCB18152 for Repairs and Maintenance to Florence Muscolino's Personal Automobile). In total, Muscolino had her car serviced four times at Franklin Ford between January 2000 and October 2001, all for which the Local paid. *Id.*

56. Former Local 79 President Noviello also had his personal automobile maintenance and repairs performed at Franklin Ford. GEB Ex. 22 (Franklin Ford Invoices #96962 – FOCS17098 for Repairs and Maintenance to Frank Noviello's Personal Automobile). In total, Noviello had his car serviced four times between July 2000 and September 2001; the Local paid the invoices totaling $487.00. *Id.*

57. Local 79 member Billy Schmidt (Schmidt), who also worked in the hiring hall as a dispatcher, received a car alarm and hands-free telephone system from Franklin Ford valued at $1,356.25. GEB Ex. 23 (Franklin Ford Invoices #102497). Schmidt told investigators that Kearney arranged for the installation and it wasn't clear to Schmidt whether the Union paid for the installation or the dealership provided in appreciation for the business that the Union gave it. Tr. 56.

### Shemore Construction, Inc.

58. Shemore Construction, Inc. (Shemore Construction), is a small Union contractor generally known in the Union through its principal, Sean Redekin (Redekin). Tr. 48. Shemore Construction has done work for both Local 79 and the Mason Tenders' District Council. *Id.*

59. In early 2003, Shemore Construction billed the District Council and Local 79 for work performed on its new offices. Tr. 49. LIUNA investigators found the invoices inflated and found no evidence that the Union had taken any other bids for the work. *Id.*

60. On January 21, 2003, Redekin submitted an invoice to Silveri for "Supplied and Installed bookcases & shelving in the office of the Mason Tenders District Council as per your request." GEB Ex 15 (Shemore Construction Request for Payment 057). The invoice was for $12,560.00, which Local 79 paid eight days later. *Id.* (Local 79 Check # 22521 for $12,560.00).

61. The work performed for $12,560.00 at the Local 79 offices consisted of constructing two peepholes in two separate office doors, as well as constructing and installing 20 shelves, ranging in length from 29 inches to eight feet long and less than an inch thick, on metal wall brackets. *See* GEB Ex. 16 (Twelve Photographs of Work Performed at Local 79 Offices).

62. The invoice was not itemized and the $12,560.00 charge for the work performed was clearly inflated.

63. On March 4, 2003, Redekin submitted another invoice to Silveri for work performed; the Local never obtained other bids for this work either. GEB Ex 17 (Shemore Construction Request for Payment 058). The invoice for $11,030.00 reads,

We request payment for work completed at the above job location [M.T.D.C.]. Breakdown as follows;

1. Furnished & Installed shelving and brackets. (M.T.D.C.)

2. Building & installing organizing cabinet to Mail room. (M.T.D.C.)

3. Installed plaques and pictures in front entrance. (M.T.D.C.)

4. Hung pictures and shelving at various offices. (M.T.D.C.)

5. Installed partitions to Mens 6th floor bathroom. (M.T.D.C.)

GEB Ex 17 (Shemore Construction Request for Payment 058).

64. The Mason Tenders' District Council paid Shemore Construction $11,030.00 on May 9, 2004. *Id.* (District Council Check # 2570 for $11,030.00).

65. Photographs of the Shemore Construction work reveal that one brass plaque, one bulletin board, and eight photographs were hung in the Mason Tenders' reception area. *See* GEB Ex. 18 (Nine Photographs Taken of Work Performed at Mason Tenders' Offices). One 4' X 8' shelf was constructed for the mail room. *Id.* Five shelves were installed in offices, none of them longer than 44". *Id.* Two partitions were erected in the men's room. *Id.*

66. The invoice, although more descriptive than the one submitted to Local 79, still did not itemize the specific cost of each of the projects. Dividing the bill evenly, each of the 18 separate tasks cost the Mason Tenders' District Council $612.78.

67. In contrast to the costs Shemore Construction charged Local 79 and the Mason Tenders' District Council, it also performed comparable work for the Greater New York L.E.C.E.T. *See* GEB Ex. 19 (Shemore Construction Request for Payment 060). For $4,488.00, or one-third the cost Local 79 paid, Shemore Construction built new office partitions, supplied and installed a new door and hardware, completing taping and polishing, repatched the existing ceiling tile and grid, and completed painting of new walls, door, and frame. *Id., see also* GEB Ex. 20 (Seven Photographs of Work Performed for L.E.C.E.T.).

68. However, LIUNA investigators uncovered a possible explanation for the seemingly inflated billing of the Mason Tenders' District Council and Local

79. District Council Business Manager Silveri was constructing an addition to his house and, in the process, had employed some tapers and painters who were also employees of Shemore Construction. Tr. 52 – 53.

69. When asked, Silveri could not recall how much he paid the workers, but thought a friend of his paid them in cash. *Id.* Not surprisingly, there was no evidence or proof of payment. *Id.* The IHO finds Silveri's explanation incredible; there is a strong inference that the Union paid for at least part of his home addition.

### Tribeca Office Supply, Inc.

70. In 2002, Local 79 purchased office furniture from Tribeca Office Supply, Inc. (Tribeca Supply) for its new office spaced, shared by the Mason Tenders' District Council. Tr. 60 – 62.

71. According to the information the GEB Attorney received from the persons interviewed and deposed, Kearney was the person responsible for acquiring the furniture and Cefalo was the "point person" designated to review available furniture and determine what the Union should use in the new space. Tr. 62.

72. Tribeca Supply is a small store, featuring greeting cards and copying services. Tr. 64; *see also* GEB Ex. 24 (Photograph of Tribeca Supply). It has no showroom and displays no furniture.

73. The photograph of the storefront belies its selection by the Union as the recipient of the $488,000 furniture contract;[6] Tribeca Supply ordered the office furniture out of a catalog. Tr. 65 -66. None of the officers could explain why the Union did not deal directly with the distributors. *Id.*

74. In 2001, Local 79 paid Tribeca Supply $88,000 for a number of items, including offices supplies and an occasional chair or desk for the old offices. *See* GEB Ex. 25 (Local 79 Register QuickReports for Tribeca Supply).

75. In 2002, Local 79 paid Tribeca Supply $527,000; $382,000 was spent on furniture and $42,000 for storage.[7] *Id.* For example, 13 officers' chairs were

---

[6] The overall cost of furniture was $617,000.00. *See* GEB Ex. 26 (Local 79 Account QuickReport for All Transactions).
[7] The explanation for the storage costs was a delay in the moving date, although most of the Executive Board did not know that $42,000 was allegedly spent for storage. Tr. 72. Those who were aware that there might have been storage costs involved had absolutely no idea where the furniture was stored. Tr. 73.

approximately $1700 apiece, 40 leather office chairs were approximately $1600 apiece.

76. In 2003, Tribeca Supply billed Local 79 $109,000; $62,000 of which was furniture. *See* GEB Ex. 25 (Local 79 Register QuickReports for Tribeca Supply). For example, Local 79 ordered seven brass desk accessories, seven brass business card holders, and ten brass wastebackets for $9,309.50. *See* GEB Ex 27 (Local 79 Purchase Order #402 of 1/2/03). The average price of each of the 24 items was $387.90. *See* GEB Ex. 29 (Tribeca Supply Purchase Order of 7/10/02 for Local 79 Chairs to be Delivered and Set Up at 520 Eighth Street).

77. Documents from Tribeca Supply indicate that the Local spent $42,000 to furnish Kearney's office alone. *See* GEB Ex. 28 (Tribeca Supply Purchase Order of 6/11/02 for Local 79 Furniture to be Delivered and Set Up at 520 Eighth Street).

78. LIUNA investigators were also concerned about the disposable nature of the goods purchased from Tribeca Supply because it is easy to hide an embezzlement or misuse of money with a vendor of goods that the Local may claim it has used without any evidence of the goods ever existing. Tr. 71 -72.

79. Finally, many officers received gifts from Tribeca Supply after the move in or about Christmas 2002. Tr. 73 - 74. For example, Cefalo received a Coach bag valued at $450, Loscalzo received a Waterford desk lamp valued at $150, and Lorraine Perry, the office secretary, received five $100 American Express gift certificates. *Id.*

80. Although other vendors were willing to discuss their interactions with the Local, Tribeca Supply has consistently refused to cooperate with LIUNA investigators, despite numerous attempts to contact the company. *Id.*

Other Questionable Expenditures of Union Funds

81. In or about June 2002, Local 79 Executive Board member Cefalo traveled to Las Vegas, Nevada for Kearney's wedding. Tr. 57. During that trip, Cefalo spent $2,200 of Union funds. *Id.* When the expenditures were questioned, Cefalo reimbursed that money to the Union. *Id.*

82. Former President Noviello charged the Union $285 for a personal trip to Dallas, Texas, certain party items totaling $120, and $220 for a hotel room. Tr. 58. Noviello also reimbursed the Union when presented with these expenses. *Id.*

83. Business Manager Loscalzo had a number of personal meal expenses in Las Vegas, Nevada, totaling $900, which he believed were business related. Tr. 58 - 59. The GEB Attorney did not agree that the expenses were business

related and Loscalzo reimbursed the Union immediately when presented with a bill for those meals. *Id.*

### Role of the Local 79 Executive Board

84. Most of the officers and Executive Board members that remain at the Local maintained throughout the course of the investigation that they were unaware of Kearney's actions. In essence, they have placed the blame for the majority of the wrongdoing squarely on Kearney. Tr. 61.

85. After the investigation, the GEB Attorney became concerned that officers and Executive Board members knew that Kearney was giving away gifts "like Santa Claus," but did not inquire into the source of the funds for those gifts despite the fact that Kearney had oversight over the Local's money. Tr. 19 – 20.

86. Moreover, the auditors found that many of Kearney's expenditures, discussed *supra*, lacked documentation.[8] Tr. 21. Some of the officers believed that the accountants were primarily responsible for picking up the discrepancies and did nothing proactive on their own. Tr. 23.

87. Local officers had a pervading view that Kearney was solely responsible for the Local's finances. Tr. 59 – 60. More than one of the officers and Executive Board members described financial matters as Secretary-Treasurer Kearney's "department," with a staff unto itself, and therefore neglected any inquiry regarding financial matters. Tr. 60. The IHO finds such statements incredible.

88. Local 79 was completely devoid of any sense of checks and balances between officers and "departments." Tr. 75. The officers and Executive Board members interviewed stated that they had no idea how much the cost of the furniture for the new offices was going to be until the bills came in, and assumed that was Kearney's responsibility. Tr. 70. Even Cefalo, the designated "point person" for the furniture purchases from Tribeca Supply, was unsure of what the furniture costs would be until the bills arrived. *Id.*

89. A number of Executive Board members were also unaware of LIUNA policies. *Id.* For instance, many Executive Board members did not realize that

---

[8]  One member of the office staff knew that the expenses were not being documented, but feared that she would be fired or no one would find her story credible so she did not come forward. Tr. 22. Late in 2002, the same office staff member suspected that Kearny was embezzling, but still did not come forward. Tr. 23.

the Inspector General must clear contracts of $150,000 or more.[9]  *Id.*  Similarly, they did not know that gifts or donations of $10,000 or more had to be cleared with the Inspector General.[10]  *Id.*

90.  Some of Kearney's embezzlement was attributable to the Local's practice of allowing him to double sign checks instead of seeking a second signature.[11]  Tr. 76.  Executive Board members claimed that they were either unaware that the practice existed or that they were unaware of the frequency with which Kearney was double signing.  *Id.*

91.  The Executive Board members' explanations are not credible.  At a minimum, the Executive Board officers and members should have been aware of Kearney's misuse of his Union American Express card, which went unnoticed

---

[9]  The General Executive Board's Policy on Contract Procedures states:

> [A]ll proposed contracts in excess of $150,000.00 to be entered into by LIUNA or any of its affiliated or subordinate bodies shall be submitted to the Inspector General.  If the Inspector General determines that entry into such contract is inconsistent with the objectives and purpose of the [Ethical Practices] Code or the EDP, LIUNA or its affiliated or subordinate entity many not enter into such contract.  No proposed contract shall be subdivided or apportioned in order to avoid the intent and purposes of this policy.

General Executive Board's Policy on Contract Procedures.

[10]  The General Executive Board's Policy on Gifts or Donations of Union Assets or Property states:

> [A]ny proposed gift or donation of Union property or assets to be made by LIUNA or any of its affiliated or subordinate bodies, where such gift exceeds the fair market value of $5,00.00 or where the cumulative total of such gifts or donations made to all recipients over the course of any consecutive 12 month period exceeds the fair market value of $10,000.00, shall be reported to the Inspector General.  The Inspector General may disapprove thereof upon his determination that such gift or donation is inconsistent with the objectives and purposes of the [Ethics and Disciplinary] Code or the EDP.

[11]  Kearney was allegedly able to write two signatures on the checks because former President Noviello was not in the offices all the time.  Tr. 83.

for three years, because the 2001 International Audit of Local 99 clearly identified the problem.[12]  Tr. 76 – 77.

92.  As a result of the investigation and settlement agreements reached in this matter, the remaining Union officers have taken steps to remedy the problems identified during the course of the investigation.  Tr. 82.  The Local now obtains three bids for every contract, and no longer has any dealings with Franklin Ford or Tribeca Supply. *Id.*

93.  The Executive Board is now more diligent about looking at back-up documentation for expenditures and the Vice President is now able to act as a second signatory on checks. *Id.*

## DISCUSSION

As a preliminary matter, the Supervision Agreement that the Local 79 Executive Board members voluntarily entered on July 20, 2004, was properly executed.  According to the terms of the agreement, the Supervision began on September 1, 2004.  GEB Ex. 37 ¶ 5 (Voluntary Supervision Agreement of 7/20/04).  Local 79 members present at the hearing expressed concern about the commencement date of the Supervision and the GEB Attorney's appointment of Eastern Regional Manager Pocino as Supervisor prior to the hearing.  *See* IHO Ex. 1 (Letter from the Laborers for a Democratic Union to Peter F. Vaira); *see also* Letter from Robert D. Luskin to the Officers and Members of LIUNA Local 79 of 8/20/04 (IHO Dkt. tab 1).  The Laborers for a Democratic Union asserted that the imposition of the Voluntary Supervision and appointment of the Supervisor before the hearing amounted to "the same violation of the 'Democratic Procedures' that has led us up to this [hearing]."  *See* IHO Ex. 1 (Letter from the Laborers for a Democratic Union to Peter F. Vaira).

As a matter of federal law, voluntary supervision or trusteeship agreements agreed to by a local Executive Board and considered at a subsequent general membership meeting are lawfully imposed and maintained by the International. *See Laborers Local 210, et al. v. John S. Tomasello, et al.*, 96-CV-0225A(F), Permanent Injunction ((W.D.N.Y.) August 28, 1996).  The GEB Attorney is not required to hold a hearing before the IHO for consent supervisions.  *Id.*; *see also In the Matter of Local Union 2*, IHO Order and Memorandum, 03-03T (January

---

[12]  Recommendation two of the audit report read, "Expenses – attach all corresponding receipts with written documentation on them (who, what, where, why, and when) to all American Express bills and any form for reimbursement." GEB Ex. 31 (Letter from Armand E. Sabitoni to Local Union 79 of 9/16/01, Re: 7/16/01 Audit of Local 79 by International Auditor John Connolly).  The IHO recommends, as future practice, that all audit reports sent to Union Executive Boards must be acknowledged and signed by all Executive Board members.

22, 2003). As a matter of practice, and where circumstances permit, the GEB Attorney endeavors to hold hearings before the IHO for consent supervisions to encourage member participation in the affairs of the local, help validate the actions lawfully undertaken, and perform a useful "fail-safe" function. *Id.* at IHO Dkt. tab 2. However, such hearings are not required by either federal law or LIUNA constitutions.

The evidence educed at the Supervision hearing revealed not only the obvious financial malpractice that has plagued Local 79 over the last three years, but also the indolence of the Local's Executive Board. Members and officers of the Executive Board owed a fiduciary duty to the membership of Local 79, which was seriously lacking. Ordinarily, a distinction may be drawn between the level of fiduciary duty expected from Executive Board officers, as opposed to non-officer Board members. *See, e.g., In the Matter of McGough v. Bohne, et al.*, IHO Order and Memorandum, 03-04TB (October 1, 2003) (standard for determining duty of non-officer members is whether reasonable member would have been aware of actions in question). However, in this matter, the distinction is unavailing. Under any standard of fiduciary duty, both the officers and members of the Executive Board, at a minimum, negligently abandoned their duty to oversee Secretary-Treasurer Kearney and the extraordinary purchases associated with the Local 79 move.

Local 79 Executive Board officers and members share responsibility for the actions of the individuals who committed acts violating the EDP and EPC. *In Re Local 1175*, IHO Order and Memorandum, 03-10T (June 11, 2003). A reasonable Executive Board member should have been aware of the actions in question and brought the issues before the entire Executive Board and the general membership. *Id.* Not only did the Executive Board fail to oversee any of the Local's finances, it allowed expenditure of funds without providing so much as cursory information to the membership. Lastly, some officers and Executive Board members even asserted ignorance of LIUNA regulations that have been in place for more than eight years.

The officers and members of the Executive Board's compartmentalized view and unaccountable approach to managing this Local has left its membership rightfully disillusioned over the perceived theft, corruption, and lack of democratic procedures evidenced at the hearing. As noted *supra*, the Laborers for a Democratic Union submitted a document to the IHO at the hearing, which delineated how the management had failed its membership in many respects, including hiring hall abuses. *See* IHO Ex. 1 (Letter from the Laborers for a Democratic Union to Peter F. Vaira). Local 79 member Peter DiNuzzo also spoke at the hearing, rightfully noting that, if the Local were a company and any one of the Executive Board members was the Chief Executive Officer, most of them "would have already been fired." Tr. 105:8-11 (DiNUZZO). DiNuzzo succinctly expressed the membership's resultant plight, "There is no trust there. There is no trust at all." Tr. 106:18-19 (DiNUZZO).


DiNuzzo went so far as to suggest that LIUNA consider two well-known outside persons as Supervisors of Local 79 on the grounds that there was such a lack of trust in the International's selection of Supervisors. Tr. 107 (DiNUZZO).

## CONCLUSIONS

1.   The actions of the Local 79 individuals whom LIUNA has removed from office are outrageous. Their conduct is even more disturbing when one considers that the most of them were instated as reform candidates following the formal federal trusteeship of the Mason Tenders' District Council, which was brought about because of the federal crimes committed by members of the District Council and its locals.

2.   The Executive Board officers and members who did not directly participate in the financial malfeasance nonetheless utterly failed in their fiduciary duty to the membership of this Local. No amount of excuses can justify the Executive Board officers and members allowing the myriad of abuses to continue for three years unnoticed. Moreover, their averred unawareness of LIUNA policy that has been established for eight years is as incredible as it is intolerable.

3.   There is overwhelming evidence to support this Supervision to correct financial malpractice, to restore democratic procedures, and to protect the Union as an institution. The Supervision was voluntary, although hardly an issue where, as here, there is more than enough evidence to conclude that a supervision could be imposed over any objections from the membership.

## DECISION

The evidence presented at the hearing demonstrated by a preponderance of the evidence the grounds for Voluntary Supervision over Local 79 to correct financial malpractice, restore democratic procedures, and protect the organization as an institution. The Supervision is voluntary and may continue pursuant to Article IX, Section 7 of the International Constitution.


PETER F. VAIRA

INDEPENDENT
HEARING OFFICER

Local 79
Robert D. Luskin, Esquire
Patrick Slevin, Esquire
Raymond M. Pocino, Vice President and Eastern Regional Manager

In the Matter of Local Union 79
New York, NY

Laborers' International Union of North America
Independent Hearing Officer

Docket No. 04-19T

Decided: November 1, 2004

### AMENDED ORDER

Footnote 10 of the Final Order and Memorandum, issued in the above captioned matter on September 24, 2004, erroneously reads:

> [A]ny proposed gift or donation of Union property or assets to be made by LIUNA or any of its affiliated or subordinate bodies, where such gift exceeds the fair market value of $5,000.00 or where the cumulative total of such gifts or donations made to all recipients over the course of any consecutive 12 month period exceeds the fair market value of $10,000.00, shall be reported to the Inspector General. The Inspector General may disapprove thereof upon his determination that such gift or donation is inconsistent with the objectives and purposes of the [Ethics and Disciplinary] Code or the EDP.

Ethics and Disciplinary Procedure, p.97 (April 2001 General Executive Board's Policy on Gifts or Donations of Union Assets or Property).

The Laborers International Union of North America (LIUNA) General Executive Board's revised policy as of July 10, 2001 requires only that gifts or donations of union property or assets, which exceed the fair market value of $10,000 be submitted to the Inspector General for review. *See* LIUNA FaxLine, Vol. II, No. 19. A "gift or donation worth $10,000 or less no longer must be reported even when the total value or amount of previous gifts or donations made within the 12-month period equals or exceeds $10,000." *Id.*

The correction of the text of footnote 10 does not affect the decision rendered in the Final Order and Memorandum of September 24, 2004.

*Peter F. Vaira*

PETER F. VAIRA

INDEPENDENT
HEARING OFFICER

Local 79
Robert D. Luskin, Esquire
Patrick Slevin, Esquire
Raymond M. Pocino, Vice President and Eastern Regional Manager